# LUCKEL v. CENTURY BUILDING COMPANY, Appellant.

### Division Two, November 17, 1903.

1. **Negligence:** PARTY DEFENDANT: ATTORNEY IN FACT: TRUSTEE IN POSSESSION. A trust company was the trustee named in two large issues of bonds made by a company owning an office building, and in addition was the agent or attorney in fact of the mortgagor and as such was in possession of the building for the purpose of collecting the rents and applying them to the payment of taxes, interest on the bonds, ground rentals and in paying itself for such services, the balance to be turned over to the mortgagor. The trust company also had the power to employ the elevator boys in said office building. *Held*, that the trustee was not a mortgagee in possession, but a mere agent of the landlord or mortgagor, and the proper defendant to a suit for damages by a passenger on an elevator who was injured by the negligent operation of the elevator by the employee in control thereof, was the mortgagor.

2. ——: ELEVATOR OPERATORS: CARE AND CAUTION. It is the duty of the carriers of passengers, elevators as well as railroads, to allow a reasonable time for passengers to enter and leave their cars with safety, in the exercise of ordinary care. And the liability of the carrier of passengers by an elevator in a public building is the same as that of a railroad. Both are bound to use the utmost care and skill in the choice and maintenance of machinery and appliances, and in the selection of operatives, and both are liable for the slightest negligence of an operative, irrespective of the care with which he may have been selected.

3. ——: ——: REPEATING CALL TO STOP. Where one passenger has called for the stopping of the elevator, it is not necessary for another who desires to alight at the same floor to repeat the call. Nor can the company owning the building excuse itself by the fact that, after the passenger who had given the direction alighted, the operator waited a second for the other to get off and seeing no sign of his desire to do so, suddenly and without warning released the door, which caught the second passenger and injured him, if in fact such passenger was exercising the care which an ordinarily prudent man would have exercised in like situation.

Luckel v. Century Building Co.

4. ———: CONCLUSIONS OF LAW. It is the duty of the court to instruct the jury that a certain line of conduct, if it is such that reasonable men will not differ as to its legal effect, is negligence. The instructions should, in such case, tell the jury that, if they find from the evidence certain facts to exist, those facts constitute negligence, and not leave it to the jury to say whether or not they were negligent. In doing so, the court in no manner usurps the province of the jury.

5. ———: INSTRUCTION: OMISSION OF WORD "NEGLIGENTLY." Where the instruction clearly requires the jury to find all the facts which went to make up the elevator operator's negligence, the failure to use the word "negligently" therein does not render the instruction error.

6. ———: EXONERATION BY PLAINTIFF. Where it is apparent that the plaintiff misunderstood the question when he stated that the operator of the elevator car did all he could to avoid injuring him after he had, by the negligent shutting of the door, been caught in an inextricable position, and where it is further apparent that the lowering of the elevator after he was so caught so that his body was crushed between the floor and the top of the elevator, really caused his injuries, the court ought not to sustain a demurrer on the ground that, by this inadvertent statement, the plaintiff had exonerated the defendant of negligence.

7. ———: ———: CARE IN LEAVING CAR. Where the court tells the jury that if plaintiff was not using ordinary care and prudence when he started to alight from an elevator car he can not recover, it is not error to refuse defendant's instruction to the effect that he can not recover if he attempted to pass out of the car after it began to move.

8. ———: ———: ———: A BETTER REASON. The evidence clearly showed that, although the operator may have been negligent in closing the door without giving plaintiff time to alight in safety, and thereby he was caught between the door and the door jam, and hoisted up two feet, yet he was not thereby injured, and would not have been injured had it not been for the subsequent negligent act of the operator in lowering the car, after he saw plaintiff's peril, in such a careless way as to catch him between the floor and the top of the car, thereby crushing and mangling him. *Held,* that it was not error to refuse to tell the jury that plaintiff could not recover if he attempted to leave the car after it began to move.

9. ———: DUTY OF OPERATOR. If the operator of an elevator sees, or by the exercise of ordinary care could see, that a passenger is in the act of passing out at a floor where the car has stopped, it

is his plain duty to hold his car and permit him to do so in safety.

10. ——: ——: PASSENGER AND TRESPASSER. Cases fixing the liability of a common carrier where the injured party was walking on a steam railroad track or was attempting to cross a street crossing, do not determine the duty that a common carrier owes to a passenger. The law requires the exercise of the highest degree of care for the safety of passengers that prudent men would exercise in the same or similar circumstances.

11. ——: EXCESSIVE VERDICT: $5,000. Plaintiff was a young man, twenty-two years old, in good health; he was crushed between the top of a passenger elevator car and the floor of defendant's building; his physician's bills and hospital expenses amounted to $228; prior to the accident he had earned $55 per month; after the accident, he could not work for a year, and is dependent on his exertions for a support; he suffered the greatest physical and mental pain for months, and at the trial he was constantly in need of a physician's services, and one doctor testified that it might take months or years for him to recover entirely, and two others that he never would entirely recover. Others testified, mostly experts, some of them hired, that he was not permanently injured and would soon recover. Held, that it was the duty of the jury to decide which set of these physicians they would believe, and that the court can not say, in view of the testimony, that a verdict for $5,000 was excessive.

Appeal from St. Louis City Circuit Court.—*Hon. Jacob Klein*, Judge.

AFFIRMED.

*Seddon & Blair* and *Robt. A. Holland, Jr.*, for appellant.

(1) The court erred in refusing the instruction in the nature of a demurrer to the evidence offered by defendant at the close of plaintiff's evidence. The evidence clearly showed that the defendant, Century Building Company, had nothing to do with the operation of the elevator in question. (2) The court erred in giving instruction 1, offered by the plaintiff and given by the court. It is a general instruction for plaintiff, stating to the jury at length under what circumstances the

plaintiff was entitled to recover. Said portion of said instruction declares as a matter of law, that if, while the plaintiff was attempting to alight at the fifth floor, the defendant, by its agent, suddenly caused the door of the elevator to close, and thus catch the plaintiff, and that while the plaintiff was in the door the said employee caused the elevator to ascend, and then thereafter caused the elevator to descend, and that plaintiff was thus injured, then he is entitled to recover. In other words, the instruction does not require the jury to find that such conduct on the part of the elevator operator was negligence, but declares, as a matter of law, that such conduct constitutes negligence *per se.* Under the evidence in this case, the court should have left it to the jury to determine whether, in starting the elevator under the circumstances, and causing it to ascend and then causing it to descend, the operator of the elevator failed to exercise the care that the law required of him. This was the ultimate question to be decided by the jury. The court far exceeded its power in declaring, as a matter of law, that such conduct, under the circumstances, was negligence. (3) The court erred in refusing to give instruction A, offered by defendant. The court should have given said instruction and told the jury that if the plaintiff attempted to alight from the elevator car after it began to move upward, he was guilty of negligence in so doing and could not recover. Holwerson v. Railroad, 157 Mo. 231. (4) The court erred in refusing to give instruction B, offered by the defendant. Said instruction declares that the operator of the elevator was guilty of no negligence in the manner of operating the elevator after the plaintiff was caught in the gate, in his efforts to save the plaintiff. This instruction should have been given, because it is based upon the testimony of the plaintiff himself, and because the plaintiff is bound by his own testimony. State v. Brooks, 99 Mo. 137; Feary v. Railroad, 163 Mo. 105; Erwin v. Railroad, 68 S. W.

91; Holmer v. Leadbing, 69 S. W. 23.   (5)   The court erred in refusing instruction D, offered by the defendant.   This instruction declares, in effect, that if the jury believe from the evidence that the plaintiff attempted to alight from the elevator after the door had begun to close and the elevator had started upward, and that such conduct on the part of the plaintiff was negligent and contributed to cause the injuries complained of, then the plaintiff could not recover.   This instruction was based upon the well-established rule of law that, although a person may be injured by the negligence of another, yet, if his own negligence directly contributes to cause the injury, he is precluded from recovering.   This proposition of law is too well established to require the citation of authorities.   (6) The court erred in refusing to give instruction E, offered by the defendant and refused by the court. This instruction, in effect, told the jury that if they believe from the evidence that, after the elevator stopped at the fifth floor, Mr. Yocum alighted in safety, and that the plaintiff gave no signal to the operator that he desired to alight at said floor, until after the operator of the elevator had shifted the brake by which the elevator was started, and the gate had started to close, then the operator was guilty of no negligence in so starting the elevator after Mr. Yocum alighted.   It is perfectly obvious that this instruction correctly states the law.   It is not the duty of the operator of an elevator to turn and ask each and every person in the elevator whether they desire to get off at a given floor, but it is the duty of the passengers who desire to get out at a specific floor to give some signal of their intention to the operator.   If they fail to do so, the operator has a perfect right to act upon the presumption that none of them desire to get off, and there is no negligence in his acting upon such presumption.

*J. F. & R. H. Merryman* for respondent.

(1)   The reading of the written instrument clearly shows that the Century Building Company intended to appoint the Mississippi Valley Trust Company as its agent and the Mississippi Valley Trust Company stipulates in the contract that it accepts said appointment as attorney and agent, and agrees faithfully to perform its duties.   There is no reason why a man can not appoint an universal agent to do all acts capable of being performed by him.   And as there is nothing in this contract to contravene public policy, we do not understand upon what grounds it can be attacked.   (2) Plaintiff was a passenger on defendant's elevator and is to be treated by defendant as a passenger for hire. In transporting him defendants are required to exercise the highest degree of care, and proof only of slight negligence on the part of the defendant is all that devolves on the plaintiff.   ''When a passenger on a railway train is injured without fault on his part, evidence of the injury done is a prima facie case of negligence on the defendant's part.''   (3)   Under the law and the facts in evidence, if the defendant did cause the door of the elevator to close, and did pin the plaintiff in so he could not extricate himself, and did suddenly and without warning to plaintiff start the elevator, and did carry him up about two feet, and then cause it to descend and injure the plaintiff, then the closing of the door, the pinning in of the plaintiff and the starting of the elevator suddenly and without warning were, by legal implication, a negligent act.   Swigert v. Railroad, 75 Mo. 477.

GANTT, P. J.—This is an action for damages for personal injuries, commenced in the circuit court of the city of St. Louis, March 17, 1900.

The petition in substance states that the Century Building Company is a corporation organized under

the laws of this State, and at the time of the grievances complained of was the owner of and in possession of a large office building ten stories high, located on the northwest corner of Ninth and Olive streets in St. Louis. That said building was thrown open to the public and all parties invited to enter who rented rooms and all who had business with said tenants. That for the use of its tenants and all persons having business with them, defendant had placed in said building a number of elevators for the carriage of all persons who had a right in said building to and from any floor that their business might call them, and said elevators were owned, operated and managed by defendant, its agents and employees. That the Bryant and Stratton Business College was a tenant of defendant and occupied a suite of rooms on the fifth floor and was engaged in teaching the various branches of a business education; that on the 26th day of February, 1900, the plaintiff, a young man, was a student in said college, and presented himself at the usual and customary place of entrance to one of said elevators for the purpose of being carried to the fifth floor of said building that he might pursue his studies. That he entered said elevator and the agent and servant in charge put said elevator in motion and when said elevator had reached the fifth floor it was stopped at plaintiff's request and the door guarding the entrance opened and while plaintiff, using due care, caution, and prudence, was in the act of stepping from the elevator through said doorway onto the fifth floor while the elevator was at a standstill, defendant by its agent and servant in charge of said elevator and acting within the scope of his employment carelessly and negligently, did suddenly and without warning to plaintiff cause the door to close, said door catching and pinning plaintiff and while plaintiff was in the position of one foot and half of his body on the landing on the fifth floor and the other foot and part of his body in the elevator, defendant's

said servant did cause the elevator to ascend about two or three feet, when said servant did negligently cause said elevator to descend and as the bottom of the elevator descended below the fifth floor, plaintiff unable to extricate himself was caught by the top of said elevator and crushed and mangled, fracturing his seventh and ninth ribs on his left side and tenth rib on his right side, severely injuring his spine and giving him numerous contusions on his chest, buttocks, thighs and foot, and severe internal injuries, and permanently injuring him for life. By reason of which he has been permanently injured, suffered great pain and anguish both in mind and body and has been compelled to spend large sums for medical attention, nurses, and medicine, all to the amount of $15,000, for which he prayed judgment.

The answer was a general denial and contributory negligence.

The cause was tried before Judge Klein and a jury, and resulted in a verdict for plaintiff for $5,000. Defendant appeals.

There is only a slight difference in the statements of the respective counsel as to the controlling facts of the case. Plaintiff's statement is somewhat fuller, and leaving out immaterial matter is substantially as follows:

Plaintiff was a young man twenty-two years of age, and a student in the Bryant & Stratton Business College in the Century building. Dr. Carpenter, the principal of the college, testified that twenty-four rooms on the fifth floor of this building were occupied by the Bryant & Stratton Business College.

The plaintiff on the 26th day of February, 1900, at about the noon hour, twelve o'clock, took passage on defendant's elevator at the first floor bound for the fifth floor where said college was located. There were three passengers in the elevator. The elevator stopped at the third floor and let one of the passengers, a lady,

off. There then remained in the elevator Samuel J. Hunt, the operator; Morris P. Yocum, and the plaintiff, Edwin Luckel. The elevator was four feet three inches in width and five feet five inches in lenth. The gate was three feet one inch wide. Morris P. Yocum, on entering the elevator, called out the fifth floor. Plaintiff did not call out the floor, but stood right behind Yocum within two feet of the door of the elevator with the operator on his right hand. The elevators face toward the east. Luckel, the plaintiff, stood just behind Yocum and within two feet of the elevator door. When the elevator reached the fifth floor, Mr. Yocum stepped out. Luckel, the plaintiff, started out of the elevator just as Yocum started out. Hunt, the operator, says at this point: "I waited a second and took it for granted that he was going on to the other floor." Mr. Yocum took four steps outside of the elevator when he was attracted by an exclamation of the plaintiff which was, "Didn't you know that I wanted to get off here?"

There were three diagrams in evidence, of the various positions of the plaintiff. They are numbered 1, 2 and 3. No. 1 shows the plaintiff in the act of getting out of the elevator with one of his feet on the fifth floor of the defendant's building, and the other in the elevator. Mr. Yocum saw him in the position as illustrated by diagram No. 1.

NO 1 (no scale)
Floors of car & Corridor on one level.

As the plaintiff was stepping out onto the fifth floor of the defendant's building the operator, Hunt, closed the door of the elevator. This closing of the door or gate of the elevator pinned the plaintiff in between the gate and the side of the elevator screen. Plaintiff could not extricate himself from this position, and while in this position and unable to extricate himself, the operator, Hunt, started the elevator. It ascended about two feet. The operator, Hunt, then stopped the elevator. The position of Luckel, the plaintiff, when the elevator had ascended about two feet, is illustrated in diagram No. 2. The elevator came to a full stop at this point. Luckel, the plaintiff, could easily have been taken out of the elevator and would have escaped with only a slight bruise. What occurred at this point is best told by Hunt, the operator: "Q. It [referring to diagram No. 2], illustrates it at about two feet, and you came to a full stand at that time? A. Yes, sir. Q. Luckel could have been taken out of the position he was in, could he not? A. Well, he could have got back in the car."

At this point the defendant's operator of the elevator lowered the elevator and crushed the plaintiff

Luckel v. Century Building Co.

between the top of the elevator and the fifth floor. The position at this point is illustrated in diagram No. 3. The testimony of the operator himself was as follows: "Q. You let the car down at that point? A. Yes, sir. Q. Then what occurred? A. Why, I kept letting it down till he got down to the floor, watching him and probably watched him more than—I should have watched the elevator more than I did, and let the elevator too low; that is, low enough to strike him." At this point the plaintiff became unconscious. He was taken out of the elevator by two witnesses, Messrs. Pollard and Baldwin, who testified in the cause.

The accident occurred at the noon hour, about ten minutes after twelve o'clock. For three-quarters of an hour the plaintiff was unconscious. He remained about an hour and a half at the college and was taken in an ambulance about two o'clock to the city dispensary, and from there to the city hospital. At this time his pain was intense in his ribs and back. At about four o'clock in the evening he vomited, and kept it up until ten o'clock. On the Saturday following (injured on Monday) he was removed to the Baptist hospital. On arriving there, a plaster cast was put on him around his chest, and for five weeks he lay in bed without moving with this plaster cast around him, at the end of which time a crinoline cast was put on him, it being a little lighter than the plaster jacket. This was kept on him until April 9th, on which day he was able to get out of bed for the first time. The crinoline cast was then put back and kept on him until May 8th. On April 21st he was removed in a rubber-tired carriage from the Baptist hospital to his father's house. After the crinoline cast was taken off of him, a corset was put on him and kept on him up to and including the day of the trial. His condition on the day of the trial, as told by himself, was as follows: "I have constant pain right in my back daily, night and day; and at night sleeping, I sleep well until I begin to move. That

will make me wake up, and it causes something like twice a week I notice now that there is a snap right in the back, just like sometimes your knee cap snaps when you turn over. But there is constant pain all the while. . . . Last week I wanted to sweep mother's floor and I had to quit that. And then I had a lid to my trunk; my brother had to lift that, and so forth. These little simple things. I don't even stoop over to pick up anything.'' Plaintiff further testified that his wages as a machine hand previous to entering college were $55 a month.

The plaintiff's expenses were, according to the evidence, $28 expended by himself, $71 by Dr. Carpenter in payment of his board at the Baptist hospital, and $131, his indebtedness to Dr. Bleyer; besides, it was shown that he would not be able to work for a year or more; that he was then paying for his board at his father's house; and that he was then under the care of a physician and would be for a long time.

## I.

Among the contentions of the defendant it is insisted that the court should have sustained a demurrer to the evidence, because, as it contends, the testimony disclosed that the Mississippi Valley Trust Company was in possession of the building and was operating the elevator in the management of which plaintiff was injured; that the man, Hunt, who was running the elevator, was the agent of said Trust Company and not the Century Building Company. On this point the relation of the Century Building Company and the Trust Company was shown by Mr. Robert McLaren, the president of the Century Building Company, and certain documents offered and read in evidence.

Mr. McLaren testified that the rents of the building were collected by the Trust Company; that it was attorney in fact for the building; that the relationship of

the two was established by writings and he knew of no other relationship outside of those instruments.

These documents consisted of two deeds of trust, one of date December 18, 1896, by the said Century Building Company to the Mississippi Valley Trust Company as trustee to secure $600,000 in bonds of the Century Company, and the other, of date October 1, 1897, to secure a further issue of bonds to the amount of $150,000 and the third instrument was a power of attorney, in words and figures following:

"This agreement, made and entered into this eighteenth day of December, 1896, by and between the Century Building Company of the city of St. Louis, State of Missouri, a corporation organized under the laws of said State (hereinafter called 'Century Company'), party of the first part, and the Mississippi Valley Trust Company, of the same place, a corporation organized under the laws of the State of Missouri (hereinafter called 'Trust Company'), party of the second part, witnesseth:

"That, whereas, said Trust Company on, to-wit, the third day of December, 1896, entered into a certain agreement with the said Century Company to purchase from said Century Company six hundred thousand dollars of its bonds on the terms and conditions set forth in said agreement; and, whereas, a portion of said agreement, on the third page thereof, was and is in words and figures as follows: 'The Century Building Company will furthermore enter into an irrevocable agreement with your company in regard to its trusteeship of mortgaged property, giving it such powers as you may reasonably deem necessary or advisable in connection with its trust, and making it the agent of the property for the renting of the building, collection of rents, payment of interest, taxes, ground rent, maintenance and management of the building and operating expenses, its compensation therefor to be three and one-half per cent on the amount collected from rentals

of the said property. The agreement referred to shall continue during the life of the bonds, and shall be in the nature of a further assurance under the mortgage and shall be recorded,' and, whereas, this agreement is intended to carry out and accomplish the purposes of said portion of said purchase agreement:

"Now, therefore, the said Century Company, party of the first part, as aforesaid, for value received, does hereby appoint and constitute the said Trust Company, party of the second part, as aforesaid, its true and lawful attorney in fact, to rent for it, the said Century Company, and in its name, the building, and each and every part thereof, now being erected by said Century Company, on the premises described and set forth in the deed of trust given to secure said bonds, viz.: on the following premises in the said city of St. Louis, bounded south by Olive street, east by Ninth street, north by Locust street, and west by an alley, with the further power, during the continuation of this agreement, to collect all rents accruing to said Century Company from any portion of said building, and to make out of the same the following payments and disbursements, to-wit:

"First. To pay all taxes of every kind and character which may, during the continuance of this agreement, be imposed upon said building and the grounds on which the same is situated.

"Second. To pay all ground rent which may become payable from time to time to John W. Kauffman, or his assignee, and to Ellen Durning, or her assigns, by reason of the covenants of the two leases set forth in said mortgage or deed of trust.

"Third. To pay the semiannual interest as it matures from time to time on said bonds.

"Fourth. To pay all expenses connected with the maintenance, repairs and management of the said building and operating expenses thereof.

"Fifth. To pay all insurance covenanted by the

said Century Company in said deed of trust to be taken out on said premises.

"Sixth. To pay over the balance of said rents to the said Century Company, after deducting from the rents as collected as compensation to said Trust Company for its services as said attorney in fact and agent, the sum of three and one-half per cent on the amount collected from said rentals of the said building and property.

"While the above matters are set out as first, second, etc., it is not intended thereby that the party of the second part shall be obligated to pay on account of said items in the order named, but, on the contrary, the party of the second part is expressly given authority and right to use its discretion in the premises.

"In making said settlements with the first party, the second party may also use its discretion as to what amounts it shall from time to time retain in its possession to reasonably anticipate said payments or any of them.

"The terms and conditions of the renting of the property or any part thereof, and also the amount to be expended for maintenance, repairs, management and operating the building, to be at the discretion of the party of the second part.

"This agreement is irrevocable and shall continue during the life of the bonds herebefore referred to, and until the same are fully paid, together with the semi-annual interest falling due thereon.

"It is further agreed that all leases heretofore made or contracted for by said Century Company, with respect to any portion of said building, shall be recognized and regarded as of continuing force against said party of the first part, a list thereof having been furnished the party of the second part.

Vol 177 mo—40

"The said Trust Company, party of the second part, hereby accepts said appointment as attorney in fact and agent, and agrees faithfully to perform its duties with respect to same.

"In witness whereof, the said Century Company has caused its name to be hereunto subscribed by its president, and its seal to be hereunto affixed, attested by its secretary, and the said Trust Company has hereunto caused its name to be subscribed by its president with its seal affixed, attested by its secretary, the day and year first above written. Executed in duplicate," etc.

We think a proper construction of these several writings leads to the conclusion that the Mississippi Valley Trust Company was not in possession by virtue of any default in the mortgages of the Century Building Company, but that it was the agent and attorney in fact for renting and collecting the rents on said building and as such agent was authorized to hire and discharge employees to run the elevators and that its acts in so doing were those of an agent and not a mortgagee in possession. When in its capacity of agent for the renting and management of this building it employed Hunt to operate the elevator, Hunt became thereby the servant of the Century Building Company, and that company liable for his acts in the scope of his employment.

We think the circuit court correctly overruled the demurrer to the evidence as to this point, and instructed that for the purposes of this case it must be held that the Century Building Company was in charge and control of said building, and of the elevator in question.

## II.

The first instruction given in behalf of plaintiff is assigned as error, or rather the following portion thereof: "And if the jury further believe and find from the evidence that when defendant's said elevator had reached the fifth floor of said building on which the

Bryant & Stratton college was located, it was stopped and the door guarding the entrance opened by defendant's employee and if the jury believe from the evidence that the plaintiff used and exercised due care and caution and prudence on his part, and such care, caution and prudence as a man of ordinary care and prudence would ordinarily use and exercise under similar circumstances, and that while using such care and while attempting to step out of the elevator while it was at a standstill, to said fifth floor, defendant, by its employee in charge of said elevator, suddenly and without warning to plaintiff caused the door of said elevator to close, catching and pinning plaintiff so that he could not extricate himself, and if the jury further believe and find from the evidence that while plaintiff was pinned in the door he had one foot on the fifth floor of defendant's building and the other foot and part of his body in the elevator, and that while plaintiff was in such position defendant by its employee caused said elevator to ascend about two feet, and if the jury believe from the evidence, that defendant's employee caused said elevator to descend and that plaintiff while pinned in the door and unable to extricate himself was pressed down with said elevator and caught between the top of the elevator car and the fifth floor of defendant's building, and received the injuries mentioned in evidence, then plaintiff is entitled to recover.''

The objection is that by this instruction the court undertakes to say that certain acts constitute negligence, instead of leaving it to the jury to determine whether under the circumstances such conduct constituted negligence. Whether this was error or not must be determined in the light of the law applicable to the duty of those who operate elevators in the circumstances of this case. Plaintiff was a passenger and entitled to be carried on the defendant's elevator. It was his duty to exercise ordinary care to keep from being hurt. The duty of the defendant to him was that of a carrier of

passengers. In Lee v. Knapp & Co., 155 Mo. loc. cit. 641, the obligation of such a carrier is tersely stated in an extract from the 10 Am. and Eng. Ency. of Law (2 Ed.), page 946, as follows: "A carrier by elevator is not an insurer, but is required to exercise the highest degree of care in everything calculated to insure the safety of his passengers. There is no distinction in law between the duties and liabilities of a carrier by elevator and one by railroad. Each is bound to the use of the utmost care and skill in the choice and maintenance of machinery and appliances, and the selection of operatives, and the liability of both for the slightest negligence of an operative, irrespective of the care with which he may have been selected, resulting in damages to a passenger, is, in its last analysis, identical."

This same rule was reasserted in Becker v. Lincoln Real Estate and Building Company, 174 Mo. 246, and Mitchell v. Marker, 62 Fed. 139. Again, it is the settled law of this court that it is the duty of carriers of passengers, elevators as well as railroads, to allow a reasonable time for passengers to enter and leave their cars with safety, in the exercise of ordinary care. [Dougherty v. Railroad, 81 Mo. 325; Bertram v. Railroad, 154 Mo. 662; Becker v. Lincoln Real Est. & Bldg. Co., 174 Mo. 246.]

In the case last cited MARSHALL, J., quotes with approval Keller v. Railroad, 27 Minn. 178, 6 N. W. 486, wherein it is said, "Those in charge of trains are bound to presume that there may be such persons in the cars [persons desiring to leave the cars] and, unless they know there are not, they have no right to start the trains until they have waited long enough to allow such passengers to alight; nor, even after waiting a reasonable time for such persons to get off, have they a right to start the trains without using reasonable care to ascertain if there are such persons in the act of getting off."

In the Becker case the facts were strikingly similar to the facts in this case. In that case a lady was a pas-

senger on an elevator with an escort. He called for a certain floor. She did not. When the car reached that floor her escort preceded her and left the elevator, and she attempted to follow. The controversy was as to the duty of the operator in allowing her an opportunity to get out, and MARSHALL, J., said: "When any one passenger directs the operator to stop the elevator at a certain floor, it is not necessary for every other passenger who desires to get off at that floor to repeat the direction, but it is the duty of the operator when so directed by any passenger, to stop at such floor for a length of time sufficient for that passenger and any other passengers who desire to alight at that floor to reasonably do so, and before again starting the elevator it is the duty of the operator to use reasonable care to ascertain if there are other persons in the act of getting off." In this case, there were but two people in the elevator when it reached the fifth floor, Mr. Yocum and the plaintiff. Mr. Yocum had indicated a desire to get off at the fifth floor and the car was stopped for the purpose of enabling him to do so. Plaintiff did not call for a stop in addition to Mr. Yocum's, neither was it necessary for him to do so. His testimony is that he stood about two feet behind Yocum, and started to alight just after the latter had left the elevator. He had reached the door and had placed one foot on the floor of the building and his body partly outside of the elevator when the elevator door was closed on him and the elevator started to ascend. Hunt, the operator, testified, that after Mr. Yocum got off, he, Hunt, waited *a second* to see whether plaintiff was going to get out and seeing no evidence, released the door, took it for granted he wanted to go to one of the upper floors. Under the evidence of Yocum, Hunt and plaintiff, there can be no doubt that plaintiff was a passenger in the strictest sense and entitled to all the care which the law exacts of a carrier of passengers; that the car stopped at the fifth floor to

let Mr. Yocum off. To entitle plaintiff to recover the court required the jury to find, and by their verdict they must have found, that when he attempted to leave the elevator he was exercising the care which an ordinarily prudent man would have exercised in a like situation, and that while he was attempting to alight the car was at a standstill and that the operator suddenly and without warning caused the door to close and caught plaintiff in the act of alighting and pinned him so that he could not extricate himself, and while plaintiff was in this position caused the elevator to ascend about two feet and then reversing the lever, caused the elevator to descend so as to crush plaintiff's body between the floor and top of the elevator car. Negligence is ordinarily a question of fact for a jury, but it is not correct, as counsel assume to say, that a court can never instruct a jury that a certain line of conduct is negligence. The courts are almost daily called upon to declare as a matter of law that the plaintiff's concurring or contributory negligence bars his recovery, and the courts constantly instruct the jury that from certain facts a certain legal consequence follows. When reasonable men may fairly differ on the question the courts do not assume to decide as a matter of law that certain facts constitute negligence, but the proper conclusion to be drawn from a conceded state of facts, admitting of but one inference, is a question of law. [Sindlinger v. Kansas City, 126 Mo. 315.] Hence, when the court submitted to the jury in this case, the finding of the facts above stated and then advised that if they so found, they should return a verdict for plaintiff, it in no manner usurped the province of the jury. Given the conditions enumerated in instruction No. 1, there can be but one opinion and that is that the conduct of defendant's servant in charge of its elevator was negligent. The excuse urged that perhaps the elevator might have been out of repair, is without the semblance of evidence on which to base such a hypothesis. On the contrary, there is no pre-

tense that the elevator failed to respond to the will of the operator. He says himself, "Why, I kept letting it down till he got down to the floor watching him, and *probably watching him more than* — I should have watched the elevator *more than I did,* and let the elevator a *little too low, that is, low enough to strike him.*"

The absence of the word "negligently" from this instruction is the only criticism to which it can be subjected.

In Jackson v. Railroad, 118 Mo. 224, in defining the duty of a conductor to afford passengers an opportunity to alight in safety, the instruction failed to use the words "highest degree of care of a very prudent person," or "utmost care and skill," but told the jury that if the car was stopped, it was the duty of the conductor to cause the car to remain standing until plaintiff had a reasonable time to alight, and if while the car was stopped "plaintiff was in the act of alighting with the knowledge of the conductor and she was exercising due care on her part and the train was suddenly started, before she had a reasonable time to get off and she was thrown upon the street and injured, she was entitled to recover."

This court said of those instructions, "They did not use the expressions as to the high degree of care to be used, but what was better, they told the jury in simple terms, what duty defendant owed to plaintiff at the time, and that was simply a reasonable opportunity to alight from the car in safety, exercising ordinary care on her part."

If the jury found, as they clearly did find, that the operator of this elevator, after having brought it to a standstill for passengers to alight at the fifth floor, and while plaintiff was endeavoring to leave the car, suddenly and without warning hoisted the elevator while plaintiff, right before his eyes, was passing out and at the same time sprung the door against plaintiff so as to pinion him between the door and the post and

rendered him incapable of extricating himself, and with full knowledge of the peril to plaintiff, then lowered the elevator so as to crush him between the top of the elevator and the floor, there can be no question that it was negligence for which his employer must be held responsible. He says himself he ought to have been paying attention to his work and failed to do so.

We are of the opinion there was no error in the instruction in the light of the undisputed evidence on this point.

But there is a still further contention in this connection, and that is, that plaintiff himself exonerates the operator from blame after he was caught in the door.

Up to the time the car began to descend plaintiff had not been hurt or seriously injured. It is plain, therefore, that although the defendant's operator negligently failed to give him a reasonable opportunity to pass out of the car to the fifth floor and had hoisted him some three feet, if the operator had stopped the car there, or *had carefully* lowered the car to the level of the fifth floor after discovering plaintiff's peril, plaintiff would have escaped any serious hurt; but it was the negligent lowering of the car below the fifth floor, thus catching plaintiff between the top of the car and the floor and crushing him, that caused his injuries.

On cross-examination counsel for defendant asked plaintiff this question:

"Q. He did everything he could to release you? A. I *suppose* he did, yes.

"Q. You have no reason to think otherwise have you? A. No, I would not think so.

"Q. What you complain of is his allowing you to be caught in the door in the first instance? A. That is it.

"Q. You have no fault to find with his actions after that? A. I have not."

Standing alone this tends strongly to support de-

fendant's contention. But when the plaintiff's attention was called to this he testified on re-examination as follows:

"Judge Seddon has asked you and you have responded that you have no complaint to make except—other than closing this elevator door on you. Now, I want to know what injured you? How were you hurt? A. By the elevator crushing me, going down and crushing me. Q. By the elevator crushing you? A. Yes, sir. Q. Were you hurt up to the time and point in which you were shown in diagram No. 2 this morning? A. No. Q. In which you said you were about two feet up there? A. No, I wasn't hurt then. Q. You were not hurt then? A. No. Q. Then, if the ele-. vator had been stopped and you taken from it when it was two feet above the floor, as shown in diagram No. 2, would you have been injured in any way? A. I don't think I had, no. Q. Then did you understand him when you said that you had no complaint to make only by shutting the door on you? A. No, I did not. Q. You did not understand that? A. No, I did not. Q. What do you wish to say in regard to that? What is your complaint about it? A. My complaint is his reversing the elevator and crushing me to the floor. Q. And the top bearing down on you? A. Yes, sir."

And Hunt the operator testified: Q. "Luckel could have been taken out of the position he was then in (his position in diagram No. 2) could he not? A. Well he could have got back in the car."

It is apparent from the petition and plaintiff's evidence that he misunderstood the question when he stated that Hunt did all he could to save him and that he had no complaint to make of his conduct in crushing him, and he so states positively and unequivocally. The contention that a demurrer to the evidence should have been sustained on this inadvertent statement, in view of the whole record, is without merit, and equally unfounded is the assertion that there is not a scintilla of

evidence that the elevator could have been lowered without injuring him.   On the contrary, there is not a word of testimony that the elevator could not have been handled with perfect safety to plaintiff.   If it had been stopped when two feet up, the plaintiff could have gotten out without injury, and there is not even a suggestion that the elevator was out of repair or would not have responded perfectly to a careful lowering to the fifth floor.   This is made absolutely clear by Hunt's evidence.   He says he was not paying the attention he should to his elevator and ran it too low and thus crushed plaintiff.   The third assignment must be held utterly untenable.

### III.

Complaint is made that the court refused the defendant's instruction, lettered "A," which told the jury that if plaintiff attempted to pass out of the elevator after it began to move he could not recover.

There was no error in refusing this instruction, for the reason that the court had already given defendant's third instruction which told the jury that if plaintiff was not using ordinary care and prudence when he started to alight he could not recover, and for the further *and for controlling* reason that the whole evidence shows that even though Hunt was negligent in starting the elevator and hoisting plaintiff two feet above the fifth floor, no injury resulted from that negligent act in and of itself, but his injuries were the result of the subsequent negligent conduct of defendant in carelessly lowering the elevator after seeing the peril of plaintiff and thus crushing him between the top of the elevator and the floor.

And moreover, the court in its fourth and fifth instructions directed the jury as follows:

"4.   The court instructs the jury that if you believe from the evidence that the plaintiff did not indi-

cate to the operator of the elevator car in any manner by word or action that he intended to leave the car at the fifth floor, and that the car stopped at said floor long enough to enable him by the exercise of ordinary care to alight therefrom, or to indicate his intention to so alight, then the defendant was guilty of no negligence in starting the car and closing the gate, if you believe from the evidence that when he closed said gate and started said car, he could not by the exercise of the degree of care mentioned in instruction No. 1, have discovered that plaintiff was then attempting to leave the car, if you find from the evidence that he was then making such attempt.

"5. The court instructs the jury that if you believe from the evidence that the operator stopped the elevator on the fifth floor, in answer to the signal of Mr. Yocum, that Mr. Yocum safely alighted, that the plaintiff did not follow immediately behind Mr. Yocum, but waited until the operator had started the gate and had begun to shift the lever which caused the elevator to ascend, and then, while the elevator door was closing and the elevator was starting up, suddenly moved forward and attempted to alight from the elevator, the plaintiff was himself guilty of negligence and can not recover in this action, unless you further believe from the evidence that after plaintiff was pinned between the floor and the side of the elevator screen the conductor of the elevator car saw plaintiff in this situation, and saw that he was likely to be injured by the descent of said car, and failed to use the care and caution which a very prudent person engaged in the same business would ordinarily have exercised under similar circumstances, and that by reason of such failure the plaintiff was injured; in other words, even though you may believe from the evidence that plaintiff was negligent in alighting from the car and in being caught in the door of said elevator entrance, still if you further find that the conductor in charge of the elevator car in question

failed to exercise such degree of care as a very prudent person engaged in the like business would have exercised, according to the usual experience of mankind, under the same or similar circumstances, to stop said car and to enable plaintiff to extricate himself, and that such failure on the part of said conductor was the cause of plaintiff's injuries, then the negligence of the plaintiff in so attempting to alight from said elevator car is no defense to this suit."

These two instructions fully and fairly stated the law of the case and presented the defendant's case in as favorable light as it could demand and hence no error occurred in refusing defendant's instructions "A," "D" and "F," and No. 5 as prayed by defendant, and it follows that assignments 4, 6, 8, and 9 furnish no ground for reversal.

From what has already been said it is obvious the court committed no error in refusing instruction "B," asked by defendant, as it practically amounted to an instruction to find for defendant, in telling the jury there was no evidence to show any negligence on the part of the operator after plaintiff was caught in the door, whereas the operator's own evidence as to his negligence in lowering the car was ample to justify a verdict for plaintiff and it was this negligence in fact which really caused the injuries. With all the evidence agreeing that the plaintiff was in a position, after he was hoisted, from which he could have easily been extricated simply by holding the car at a standstill and when defendant was fully advised of his peril, to say that it was plaintiff's own contributory negligence which caused his injury is to ignore the fact that he was completely in the power of defendant's operator, and the operator's evidence that it was his inattention to his elevator that caused the car to descend too low and thus crush plaintiff between the top of the car and the floor, and to absolve the defendant from that high degree of

care which a carrier of passengers owes to its passengers.

There was no error in refusing it. The other instructions were properly modified by the court.

## IV.

The modification of defendant's instruction No. 4 was clearly proper. It was the operator's duty to have given plaintiff a reasonable opportunity to pass safely from the elevator, and his own evidence was that he only waited *a second* and took it for granted that plaintiff was not going to get off, but if he saw or by the exercise of ordinary care could have seen plaintiff was in the act of passing out, it was still his plain duty to have held his car and let him do so in safety. [Mitchell v. Keene, 87 Hun 266; Becker v. Real Est. & Bldg. Co., 174 Mo. 246; Swigert v. Railroad, 75 Mo. 477.]

## V.

The defendant invokes numerous cases in which the plaintiff was either knowingly crossing the track of a steam or electric railroad in front of moving trains, or was walking on the same when there was no duty imposed on the engineer or servant of the company to anticipate his presence, or stood or walked so near the track as to be struck. None of those cases have any bearing on the case before us. We are considering a case of the liability of a carrier of passengers to one of its passengers, and we hold, as all of the cases hold, that it was its duty to exercise the highest degree of care that prudent men would exercise in the same or similar circumstances. [O'Connell v. Railroad, 106 Mo. 482; Jackson v. Railroad, 118 Mo. 224; Smith v. Railroad, 108 Mo. 243; Redfield on Carriers, sec. 347.]

## VI.

No error as to the admission or rejection of evidence is asserted, and it only remains to note the contention that the verdict is excessive. The plaintiff prior to the injury occasioned by defendant's negligence was a young man twenty-two years old, in good health. He was crushed between the top of the elevator and the fifth floor of defendant's building. Besides his physicians' bills amounting to over $200, and his hospital expenses to $28, the evidence tended to prove he could do no work for a year or more. He had been earning $55 a month as a machine hand. He is dependent upon his own exertions for a support.

He was rendered insensible and unconscious by his injuries. He was taken to the hospital and was examined by three physicians, Drs. Bleyer, Pierce and Epperson. Dr. Bleyer saw him casually the first night after he was hurt. Plaintiff was suffering great discomfort. He had vomiting spells. Next morning he gave him a more thorough examination. He complained of severe pain in his back. The doctor found great tenderness over the lower part of the spine and between his shoulders. His abdomen was much distended with gas. Great pain in his chest, and couldn't move in bed. He found contusion on the right side and on the right foot, and right thigh. The left buttock was bruised. Tenderness and pain in his chest. His whole chest was bruised. Great tenderness on seventh and ninth ribs. His opinion was there was a fracture of these ribs. He continued to treat him and examine him. He had him removed to the Baptist hospital on March 3d, and put him in a plaster cast and that had to be removed on account of the pain it caused him. A new cast was put on him and kept on him until March 26th. He could not sit up on account of the pain in the lower or lumbar region of the spine and between the shoulders. On March 26th, a new plaster jacket was put on him, which was kept on

him until April 7th. After that a crinoline bandage was adjusted to him and he was kept in that until May 7th. After three months, Dr. Bleyer testified that there was a diminution in the pain, but plaintiff had not progressed as he thought he would, and at the time of testifying he was unwilling to say he would recover in six months so as to be able to go to work. It may take months or years for him to recover entirely. He was constantly in need of a physician's services.

Dr. Pierce examined plaintiff and testified to a fracture in seventh rib and great tenderness on the ninth and tenth ribs on the left side. There was a fracture of the spinous process—the ligaments showed a great deal of tenderness and swelling and that region is very tender.

The sacral ligaments were undoubtedly torn or loosened from their attachments to the bony parts. Plaintiff could not stoop at all, as late as middle of May. His opinion was he would never entirely recover. For years at least he will feel the effects of his injuries. He could not go back to work for a year.

Dr. Epperson, who had been surgeon to the Penitentiary and examining surgeon for the Metropolitan Life Insurance Company, examined plaintiff just before the trial, and found him in bed, unable to rise, and very tender in portions of body. Could not turn over without assistance, and any motion caused him great pain. He found a partial fracture of the coccyx where it joins the sacrum. In his opinion there was a severance of the invertebral substances from the bones. He considered plaintiff was in a grave condition, one from which he would not speedily recover. His own experience in such cases was he would never recover entirely.

The defendant called three physicians.

Dr. Bernays had never examined the witness. Had never seen him until he saw him in the courtroom. It appears plaintiff's counsel had offered to let him examine plaintiff. He heard the other physicians testify

and gave it as his opinion that the ribs if fractured had completely healed, and that the pain in the region of the spine was due to mere bruises there; that plaintiff would soon recover; that he was testifying as an expert, and received $100 a day, and it was not enough.

Dr. Schurk also testified. He had examined plaintiff, but not thoroughly, on the day plaintiff was taken to the city hospital. The Century Company paid him for his services in examining plaintiff. He was of opinion that plaintiff was not permanently injured.

Dr. Deutch testified he examined plaintiff and found no signs of injury to spinal cord, or any fracture of coccyx, but even if the latter was severed and dislocated the injury would not be serious, but he found no trace of injury to the bone. He had not examined him since March 26th, 1900.

It was for the jury who saw and heard this medical evidence to weigh their testimony like that of other witnesses, to consider their interest and believe or disbelieve it. If they believed, as they evidently did, the physician who was constantly in attendance on plaintiff up to the trial, and those who examined him a short time before the trial, they were justified in finding he was seriously and permanently injured. Considering the manner in which those injuries were inflicted, there appears no reason why this court should reject their finding. It was approved by one of the most careful and learned circuit judges who has graced the *nisi prius* bench of this State for many years. We find nothing which smacks of passion or prejudice in the amount of the verdict. The case was well tried, and there was no error in the instructions. The judgment is affirmed.

All concur.