MINNIE HESEMANN, RESPONDENT, v. MAY DEPARTMENT STORES COM-
PANY, A CORPORATION, APPELLANT.*—39 S. W. (2d) 797.

St. Louis Court of Appeals. Opinion filed June 2, 1931.

*Jones, Hocker, Sullivan & Angert* and *Ralph T. Finley* for appellant.

*Mark D. Eagleton* and *Allen, Moser & Marsalek* for respondent.

SUTTON, C.—This is an action to recover damages for personal injuries sustained by plaintiff while riding as a passenger on an escalator in defendant's department store in the City of St. Louis. The trial of the cause, with a jury, resulted in a verdict and judgment in favor of plaintiff for $3,000, and defendant appeals.

The accident which resulted in plaintiff's injury occurred on March 22, 1927. Plaintiff went to defendant's store to assist her son, Edwin Hesemann, to select some clothing. She also intended to make some purchases for herself. She met her son at about 11 o'clock in the clothing department on the second floor of the store. The son purchased two suits and a top coat, which he left to be altered. When this business was completed plaintiff and her son walked to the escalator which runs from the second to the first floor. There was an attendant at the top of the escalator. The

son stepped on the escalator first and plaintiff followed. She grasped the railings on each side with her hands and rode to a point about midway between the second and first floor. At this point the escalator stopped with a sudden and unusual jerk. She testified that the jerk threw her forward, and her hands were jerked loose from the railing, but she retained her foothold on the step; that the escalator then started up with a second jerk and threw her backward and to her right side and against the railing. She illustrated to the jury the way she was thrown and how she struck the railing. She testified that when she struck the railing it hurt her all the way down on her right side, from her neck down to her hip, and that she became sick and felt like vomiting; that she was so weak she couldn't talk; that as soon as she reached the first floor she went out of the building and vomited in the gutter; that her son then accompanied her to a street car, and she rode to her home, and her son returned to his place of work; that she had ridden on that particular escalator many times over a period of years; that she had never experienced any such movements before; that when the escalator worked in the ordinary manner it did not jerk or jolt at all.

Edwin Hesemann, plaintiff's son, testified that he was thirty-two years of age, and had been employed for twelve years by the Main Street Warehouse Company, as a bookkeeper. Describing the accident, he testified that the escalator stopped suddenly with an unusual jolt, remaining stopped for a fraction of a second, and then started again with a violent jerk; that the stopping of the escalator threw him forward and jerked his one hand loose from the railing; that before he could regain his balance the escalator started again and threw him backward; that the jerk was so severe that he was thrown to his left side and his knee struck the wooden railing at the side of the escalator; that as soon as he reached the bottom of the escalator he turned around and saw that his mother was white and pale, and that he helped her off the escalator and out into the street; that she vomited in the street and he held her with his arm around her while she vomited; that he then accompanied her to the street car.

John Truhe, a witness for defendant, testified that he was defendant's maintenance electrician, and had charge of the escalator; that the escalator was inspected every Sunday, and was looked over every twenty-four hours during the week; that the escalator was operated by a thirteen horse-power motor; that there were a number of cogwheels, one attached to the motor and the other to a drive shaft; that there was a chain running from one of these cogwheels to the other; that the chain was kept tight all the time so that it would not slip or jump; that at the time of the accident none of the cogs on any of the wheels were broken; that there was one switch at the

top and one at the bottom of the escalator; that the attendant in charge at the top, or any one else, could operate the switches and stop the escalator; that sometimes children would throw the switch; that if the operator turns the switch right quick the escalator stops and starts again, but that it will blow a fuse and then stop for good, that is, it does not continue to operate; that he did not know any way in which the escalator could stop right quick and start right quick and then continue; that the escalator moves at a speed of ninety-six feet per minute; that when the power is switched off the escalator moves pretty close to five feet; that the switch can be turned off at any time while the escalator is moving, and can then be turned on again without blowing a fuse, within a period of three seconds; that one could be on the escalator, standing at an angle, and have it stop with a jerk, thus knocking his hands from the railing and causing him to loose his balance, and that if it started up again before he regained his balance he would be jerked backward; that over a period of years he had watched persons riding on the escalator; that if a person is going down and the operator throws the power off it would not affect the passenger if the passenger was standing straight; that in the normal operation of the escalator there was no jerking or jolting.

Relative to the nature and extent of her injuries, plaintiff testified that when she reached her home after the accident she lay down; that she was in misery; that her entire right side bothered her and she was vomiting; that she did not feel much better the next day; that her husband rubbed her right side with liniment; that the accident occurred on Tuesday; that on Friday Dr. Coffman, her regular family physician, was called; that when he came to her home she was in bed and was still suffering with her right side; that she was suffering pain in her spine from her neck to her hip; that a rib on the right side was injured; that she suffered discomfiture in her kidneys; that the doctor saw her every day for a while and that after that he saw her frequently; that she was in bed for four weeks; that the doctor gave her hot applications for her neck, and bandaged her right side with adhesive tape; that she had this tape on her side or back for about six or eight weeks; that at the time of the trial she still suffered from spells of vomiting; that she still had a gagging sensation; that she never had any such condition before the accident; that her side and back continued to hurt her from her neck down to her hip; that the pain varied; that it was worse at some times than at others; that she suffered the more severe pains several times a week, and that when these spells came on, if they got too bad, she went to the doctor and obtained medicine.

It appears that plaintiff's husband and her four children lived with her; that before the accident her health was good; that it was

a long time after the accident, at least six weeks, before she could do any housework; that since that time she has been able to do only the lighter household duties; that she is unable to do anything like washing and ironing.

Dr. George W. Coffman testified that he visited plaintiff at her home on or about March 26, 1927; that he found her in bed; that his examination disclosed some swelling and great tenderness on pressure, in the spinal region, around the lower part of the ribs, in the region of the twelfth rib; that she also complained of pain in the cervical region of the spine, below or around the back of the neck on the right side, and also below that in the dorsal region on the right side; that he strapped the chest wall over the twelfth rib; that she had a good many clinical symptoms of a fracture of the twelfth rib, but that he was not able to ascertain definitely that a fracture existed; that he gave her practically the same treatment that he would administer for a fracture; that she complained of nausea and stomach sickness; that he gave her medicine for this condition; that he continued to treat her, calling every other day for a few days and then for nearly a month at short intervals; that after plaintiff was able to get out of bed she came to his office occasionally for treatment; that during the year and a half previous to the trial he had seen her on an average of three or four times a month; that she still complained of pain in the dorsal and cervical regions of the spine and on the right side; that he diagnosed the injury as a severe contusion of the soft part and sprain of the ligaments around the dorsal vertebrae; that in view of the fact that she had continued to suffer pain in the regions described, it was his opinion that she would continue to suffer for quite a while; that he attributed her nausea and vomiting to the nervous shock she suffered when she was thrown against the railing of the moving stairway; that her reflex symptoms indicated that, and that that frequently happens in an accident of that kind; that when plaintiff visited his office he treated her back with infra red and ultra violet rays; that stomach disorders and vomiting was not unusual in persons of advanced years, but that in plaintiff's case he could find no cause to account for her trouble, other than the shock of the accident; that she had been calling on him for a number of years and he had no history that she suffered from any stomach trouble before.

Dr. James F. McFadden, a neurologist, testified that he examined plaintiff on February 14, 1929; that she complained of pain in her back, extreme nervousness and nausea; that she described the pain in her back as being to the right of the center and extending from the neck to the lower rib, and stated that this pain was aggravated upon motion; that she said she was easily excited; that her sleep was disturbed and that she had frequent attacks of gagging and

vomiting; that he made a general examination of her nervous system; that in the course of this examination he discovered that there was a marked prominence of the muscles on the right side of the back; that the two muscles that connect the shoulder blade with the spine bulged out, and she complained of pain whenever he touched these muscles. In answer to a hypothetical question he said that in his opinion plaintiff's vomiting was a direct result of the nervous reaction to the accident; that when once a condition of that kind is set up there is no definite way of knowing just how long it will continue; that in his opinion plaintiff's nervousness was caused by the accident, and that he expected the nervous condition to last as long as the pain continued.

The cause was tried on November 19, 1929, two years and eight months after plaintiff was injured.

The court, at the instance of plaintiff, gave to the jury the following instruction:

"The court instructs the jury that if you find from the evidence that the plaintiff was using the escalator in defendant's store, in going from the second to the first floor, as a passenger on said escalator, and as a customer of defendant, and that while so doing, said escalator did suddenly and in a very extraordinary, unusual and violent manner, jerk and jolt, and that by reason thereof, plaintiff was thrown against the railing of said escalator, and was injured thereby, and that said jerk and jolt was caused through the negligence of defendant, and that plaintiff's injuries were directly caused by said negligence, then your verdict will be in favor of plaintiff and against defendant."

It appears that defendant's counsel, in the course of his argument to the jury, made a severe attack on the plaintiff's son, Edwin, asserting that Edwin did not act as a dutiful son, in that he did not show his mother proper attention at the time of the injury; that he was the cause and inspiration of the lawsuit; that it was not the plaintiff's lawsuit; that Edwin was the only one to be compensated; that if the jury gave plaintiff a verdict they would compensate Edwin, and that if they did not they would disappoint no one but Edwin. Plaintiff's counsel, in his closing argument to the jury, replying to this attack on Edwin, stated that there was no justification in the evidence for the attack, and that he did not think intelligent, red-blooded men would disregard the evidence, and for no reason be swayed by counsel's assertion that this was Edwin's lawsuit; that he wanted the jury to follow only the law and the evidence, and that when they did so they would not conclude that this was Edwin's lawsuit, and that if the jury did not go out and within five minutes bring in a verdict for $3,000 they did not have red-blood in them. Defendant's counsel objected to

the remark that the jurors did not have red-blood in them if they did not within five minutes bring in a verdict for $3,000, and requested the court to discharge the jury. The court sustained the objection, but declined to discharge the jury. Then the following occurred: MR. EAGLETON: I ask that the jury be instructed to disregard my remark. MR. WELKER: He puts in the poison and now tries to extract it. MR. EAGLETON: I have not put any poison in and I haven't attempted to. MR. WELKER: I object to the statement that he has not attempted to put poison in. The court overruled the request of plaintiff's counsel that the jury be instructed to disregard his remark. The defendant excepted to the action of the court in refusing to discharge the jury.

The defendant assigns errors here upon the refusal of its instruction in the nature of a demurrer to the evidence, upon the giving of plaintiff's instruction, and upon the refusal of the court to discharge the jury on account of the remark of plaintiff's counsel, and also complains of the verdict as excessive.

It is obvious, without discussion, that the plaintiff made out a case for the jury under the *res ipsa loquitur* rule. [Carlson v. Wells (Mo.), 276 S. W. 26, l. c. 29; Rhodes v. Mo. Pac. R. Co., 213 Mo. App. 515, 255 S. W. 1084; Heidt v. Peoples Motorbus Co. (Mo. App.), 9 S. W. (2d) 650; Stroud v. Booth Cold Storage Co. (Mo. App.), 285 S. W. 165; Bartlett v. Pontiac Realty Co. (Mo. App.), 31 S. W. (2d) 279; Petrie v. Kaufman & Baer Co., 291 Pa. 211, 139 Atl. 878; Luckel v. Century Bldg. Co., 177 Mo. 608, 76 S. W. 1107; Van Hoeffen v. Columbia Taxicab Co., 179 Mo. 591, 162 S. W. 694; Hensler v. Stix, 113 Mo. App. 162, 88 S. W. 108; Roberts v. Schaper Stores Co., 318 Mo. 1190, 3 S. W. (2d) 241; Dougherty v. Missouri R. Co., 9 Mo. App. 478; Dougherty v. Missouri R. Co., 81 Mo. 325; Laible v. Wells (Mo.), 296 S. W. 428, l. c. 430; Brown v. Winwood Amusement Co. (Mo. App.), 34 S. W. (2d) 149.]

We can see nothing in the plaintiff's instruction of which the defendant may justly complain. It was less favorable to plaintiff than she was entitled to have it, in that it does not advise the jury of the presumption of negligence arising under the *res ipsa loquitur* rule. [Scott v. Kansas City Rys. Co. (Mo.), 229 S. W. 178; Reel v. Consolidated Inv. Co. (Mo.), 236 S. W. 43, l. c. 47; Orcutt v. Century Bldg. Co., 214 Mo. 35, l. c. 51-52, 112 S. W. 470; Cecil v. Wells, 214 Mo. App. 193, 259 S. W. 884; Phister v. Gove, 48 Mo. App. 455.]

We do not think the remark of counsel complained of is such as to require this court to interfere with the discretion of the trial court in refusing to discharge the jury, under the circumstances. [Evans v. Town of Trenton, 112 Mo. 390, l. c. 399, 20 S. W. 614; Gidionsen v. Union Depot Ry. Co., 129 Mo. 392, l. c. 404, 31 S. W.

800; Huhn v. Ruprecht (Mo.), 2 S. W. (2d) 760; Huchshold v. St. Louis I. M. & S. Ry. Co., 90 Mo. 548, l. c. 559, 2 S. W. 794; Yost v. Union Pac. R. Co., 245 Mo. 219, l. c. 251, 149 S. W. 577.]

Under the evidence heretofore set out relative to the nature and extent of plaintiff's injuries, this court ought not interfere with the verdict for excessiveness. [Manley v. Wells (Mo.), 292 S. W. 67; Busby v. Southwestern Bell Tel. Co. (Mo.), 287 S. W. 434; Westervelt v. St. Louis Transit Co., 222 Mo. 325, l. c. 334-335, 121 S. W. 114; Hoover v. St. Louis Electric Terminal Ry. Co. (Mo.), 227 S. W. 77, l. c. 79; Maloney v. United Rys. Co. (Mo.), 237 S. W. 509, l. c. 516; Sacre v. St. Louis Merchants' Bridge Terminal Ry. Co. (Mo.), 260 S. W. 85, l. c. 88; Goetz v. Ambs, 27 Mo. 28, l. c. 34; Gurley v. Missouri Pac. Ry. Co., 104 Mo. 211, l. c. 233-234, 16 S. W. 11; Laughlin v. Kansas City Southern R. Co., 275 Mo. 459, l. c. 472, 205 S. W. 3; Grott v. Johnson, Stephens & Shinkle Shoe Co. (Mo.), 2 S. W. (2d) 785; Joyce v. Mo. & Kan. Tel. Co. (Mo. App.), 211 S. W. 900; Garfinkel v. B. Nugent Bros. D. G. Co. (Mo. App.), 25 S. W. (2d) 122; Llywelyn v. Lowe (Mo. App.), 239 S. W. 535; Deming v. Wells (Mo. App.), 273 S. W. 128; Shuff v. Kansas City, 221 Mo. App. 505, 282 S. W. 128; Stephens v. M. & O. R. Co. (Mo. App.), 285 S. W. 151.]

The Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Haid, P. J.,* and *Becker* and *Nipper, JJ.,* concur.