ROBERT BOND v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY,
Appellant.

Division One, October 11, 1926.

1. **PRESUMPTION: Inference of Fact: Injury to Passenger: Act of God: Proof of Specific Negligence.** Presumptions, in so far as they relate to the burden of proof or the burden of evidence, are rules of law. Some of them are based on inferences of fact; some are not. Where plaintiff while traveling as a passenger was injured, no presumption relieves him

of the burden of proving in the first instance that the carrier was negligent; it only relieves him of the necessity of alleging and proving specific negligence. From plaintiff's evidence tending to prove that he was a passenger, that the railroad train was wrecked and that as a consequence he was injured, a substantial inference of fact arises, namely, that the carrier had failed to exercise the high degree of care which the law imposes; if then the carrier introduces evidence tending to show that it was not negligent in any respect, but that the wreck was caused solely by the act of God, plaintiff's evidence does not vanish; it is still in the case, and is sufficient to support a finding for him on the issue of negligence or no negligence, and a demurrer to his case cannot be sustained solely because he fails to come forward with proof of specific negligence; nor is he required to prove the wreck, of the train, and that defendant did not exercise due care to distending to show that the unprecedented rainfall was not the sole cause of specific negligence, but he strengthens his case by contradictory evidence cover the unsafe condition caused by the storm and to have avoided the wreck.

**2. INSTRUCTION: Negligence: Affirmative Defense: Act of God: Burden of Proof.** Plaintiff makes a prima-facie case for damages by evidence tending to show that he was a passenger and that without fault on his part he was injured by the derailment or wreckage of the carriage; and the plaintiff having made such prima-facie case, the burden thereafter is upon the carrier to prove that it was without negligence and that the injury was occasioned by an inevitable accident or some cause which human precaution and foresight could not have averted. Plaintiff having thus established a prima-facie case, instructions are proper which place the burden of proof upon defendant not only to show that the wreck of the train was caused by an act of God, but that the defendant could not reasonably have anticipated, foreseen and avoided the injury to the passenger. Such a rule is not merely one of procedure, but is to be regarded as one of substantive law, adopted for the protection of passengers.

**3. ———: Special Demurrers.** Special demurrers requesting the court to declare as a matter of law that the defendant's evidence is sufficient to acquit it of any negligence in respect to the construction and maintenance of the bridge which went down under the passenger train, and in respect to the management and operation of the train, are not special demurrers at all, but in structions, and should be refused.

**4. EVIDENCE: Negligence: Rules of Railroad Company: Limited Application.** In an action by a passenger for personal injuries received when a bridge went down under the train, wherein the defendant pleads that the wreck was caused solely by an unprecedented rainfall and the act of God, a rule of the company declaring that "conductors and enginemen will make careful inquiry at all stopping places, and when thought advisable, make extra stops to ascertain the extent and severity of storms" and "in case of doubt as to safety of proceeding they will place their trains upon a siding and remain there until certain it is safe to proceed," and a rule declaring that the bridge and track foreman "during heavy storms must detail his forces to watch the road and take every precaution to prevent accident," are admissible as evidentiary facts tending to show a want of care; and if competent for any purpose, it is not error to admit them; and having been admitted, if defendant desires an instruction limiting their legal effect, it is its duty to ask it.

**5. ———: Contradiction of Foreman's Statement: Defendant's Knowledge: Hearsay: Impeachment.** The foreman of the section in which the railroad bridge was located having testified for defendant, it was proper to ask him on cross-examination whether immediately following the collapse of the bridge and the wreck of the train he had not stated in the presence of witnesses that he had reported the bridge in bad shape, and upon his

denial, to offer evidence tending to show that he had so stated, where there was evidence that the bridge piling was more or less rotten, and the defense was that the wreck was caused solely by an unprecedented rainfall; for in such case, if defendant had knowledge of the weakened condition of the bridge in time to have made renewals before the wreck occurred, that was a material fact, and the foreman's knowledge was defendant's knowledge, and the evidence was not incompetent, whether offered directly to show defendant's knowledge, or for purposes of impeachment.

6. ———: **Conductor's Statement after Wreck: Impeachment: Immaterial Matter.**  Testimony that the conductor advised the section foreman to say nothing about having reported unsafe the bridge which collapsed when the passenger train ran upon it, is competent to show he had such an interest in the subject-matter of an injured passenger's suit for damages that he desired to conceal the facts.  And where the conductor denies having made the statement, such testimony is admissible for purposes of impeachment, and cannot be excluded on the theory that it was an attempted impeachment upon an immaterial matter.

7. **INSTRUCTION: Measure of Damages: Approval of Maximum Alleged: Implication to Jury.**  An instruction on the measure of damages which fixes a maximum amount which the jury may allow, without disclosing any reason why the court has fixed the maximum as the particular figure named, carries to the mind of the jury a clear implication that the court is of the opinion that the evidence warrants an assessment up to the amount specified; and in an action for personal injuries, where many of the elements of damages are intangible, where the extent of the pecuniary loss is necessarily more or less conjectural, and where sympathy always operates, such an instruction is especially harmful.

8. **VERDICT: Elements of Damages: Earnings: Suffering: Care: Health.**  In addition to the loss of earnings, other elements of damage are to be taken into consideration in awarding compensation for personal injuries, such as the suffering endured and to be endured, the extra care and attention the injured man will require on account of his physical helplessness, and the right to health and a normal body which the negligence of defendant has destroyed.

9. **EXCESSIVE VERDICT: Eighty-five Thousand Dollars.**  A verdict for eighty-five thousand dollars for a railway postal clerk, thirty-seven years of age, who was receiving a salary of $2300 and would have been entitled to said amount until he reached the age of sixty years and thereafter to a pension for life, who was permanently injured when the mail car was wrecked, and whose shoulders, hips, legs and ankles were so badly injured, and the vision of whose eyes and the hearing of whose ears were so badly impaired, that he is permanently disabled to perform any useful work, is excessive, and the judgment is affirmed only on condition that he remit fifty thousand dollars of the amount.

---

Corpus Juris-Cyc. References:   **Appeal and Error,** 3 C. J., Section 754, p. 848, n. 13; Section 757, p. 856, n. 40; 4 C. J., Section 2619, p. 707, n. 11; p. 708, n. 21; Section 3013, p. 1031, n. 34; Section 3135, p. 1137; n. 52; Section 3139, p. 1139, n. 78.  **Carriers,** 10 C. J., Section 1302, p. 863, n. 19. 21; Section 1393, p. 983, n. 15; Section 1394, p. 983, n. 18, 23; Section 1395, p. 984, n. 29; Section 1402, p. 992, n. 70; p. 994, n. 71; Section 1425, p. 1022, n. 65; Section 1426, p. 1024, n. 74; Section 1431, p. 1034, n. 42; Section 1434, p. 1038, n. 62; Section 1440, p. 1044, n. 18; Section 1443, p. 1047, n. 57; Section 1449, p. 1055, n. 24; Section 1456, p. 1068, n. 84; Section 1468, p. 1077, n. 42; Section 1471, p. 1080, n. 52.  **Damages,** 17 C. J., Section 181. p. 869, n. 57; Section 195, p. 894, n. 78; Section 371, p. 1068, n. 46; Section 408, p. 1091, n. 85; p. 1095, n. 86.  **Evidence,** 22 C. J., Section 21, p. 78, n. 18, 19; Section 22, p. 79, n. 23, 24, 25; p. 80, n. 31; Section 25, p. 83, n. 55.  **Negligence,** 29 Cyc., p. 597, n. 42.  **Trial,** 38 Cyc., p. 1707, n. 98.  **Witnesses,** 40 Cyc., p. 2687, n. 93; p. 2714, n. 93; p. 2716, n. 95; p. 2765, n. 19; p. 2769, n. 31.

Appeal from Barton Circuit Court.—*Hon. Berry G. Thurman,* Judge.

AFFIRMED (*upon condition*).

*E. T. Miller, H. W. Timmonds, Ward & Reeves* and *Mann & Mann* for appellant.

(1) The court erred in refusing to sustain defendant's demurrer offered at the close of the whole case. Under the rule of *res ipsa loquitur,* invoked in this case, by plaintiff pleading general negligence of an injury to a passenger caused in the wreck, the plaintiff made out by presumption a case when he showed: (a) That he was a passenger, (b) the wreck, (c) his injury. But when the proof of defendant showed a "cloudburst" and an unprecedented flood, the washing out of the trestle, the wreck caused by *vis major,* then the presumptive case of negligence made by the rule of *res ipsa loquitur* is conclusively overcome and defendant is legally excused, and plaintiff will be cast on demurrer unless he comes forward and shows some act of negligence on the part of the defendant that caused, or was the moving factor directly co-operating with the act of God in producing, the wreck and injury, and unless such proof is produced, then the demurrer should be sustained. Hurch v. Railroad; 252 Mo. 48; Davis v. Railroad, 89 Mo. 350; Evans v. Railroad, 222 Mo. 456: Turner v. Haar, 114 Mo. 346; Wolf v. Express Co., 43 Mo. 421; Read v. Railroad, 60 Mo. 206; Sawyer v. Railroad, 37 Mo. 257; Reeves v. Railroad, 10 U. S. (Wall.) 190, 77 U. S. 176; Hite v. Ry. Co., 130 Mo. 135. Plaintiff's case, having been made out on a presumption, when the proof comes in of the actual facts, then the presumption goes out. Guthrie v. Holmes, 272 Mo. 233; Tetwiler v. Railroad, 242 Mo. 194; Glassman v. Harry, 182 Mo. App. 304; Hite v. Railroad, 130 Mo. 138; Sowders v. Railroad, 127 Mo. App. 119; Mockowik v. Railroad, 196 Mo. 571; Bragg v. Railway, 192 Mo. 354; Hurck v Railroad, 252 Mo. 39; Davis v. Railroad, 89 Mo. 350; Evans v. Railroad, 222 Mo. 457; Turner v. Haar, 114 Mo. 346; Wolf v. Express Co., 43 Mo. 423; Sawyer v. Railroad, 37 Mo. 259; Reeves v. Railroad, 10 U. S. (Wall.) 190; Hite v. Ry. Co., 130 Mo. 135. (2) The court erred in admissibility of testimony. (a) Plaintiff was permitted to offer the rules of the company governing conductors and engineers, bridge and track foremen, which were incompetent because they lay a greater burden on defendant than required by law; because this is not an action by an employee based upon an infraction of rules between defendant and its servants; because they mislead the jury against the defendant for violating rules rather than violating the law. (b) Plaintiff was permitted to ask hypothetical questions which were not based on any proven facts in this case. Henson v. Railway, 301 Mo. 415; Seelig v. Railway, 287 Mo. 343;

Russ v. Railway, 112 Mo. 48; Root v. Railway, 195 Mo. 377. (c) Plaintiff was permitted to ask his witness Guy Smith what was said by defendant's witness Ryan, which was not a part of the *res gestae*, was not asked in proper form for impeachment; also to show by plaintiff's witness Cooper what defense witness Ryan said. (d) Plaintiff was permitted to show what defendant's witness Phillipson said to defendant's witness Ryan; it was an attempt to impeach Phillipson on an immaterial matter. 40 Cyc. 2699; Greenleaf on Evidence, sec. 461; Hamburger v. Rinkle, 164 Mo. 398; State v. Cox, 263 S. W. 215; Connell v. Haase & Co., 302 Mo. 91; Swinehart v. Ry. Co., 233 S. W. 59; State v. Baker, 296 Mo. 51; McFadin v. Catron, 120 Mo. 263. (3) Instruction 1 is erroneous in that it places the burden of proof upon defendant, not only to show that the wreck was caused by the act of God, but also to show that the defendant could not reasonably anticipate, foresee or avoid such act of God. (a) The law is that when the defendant shows that the wreck was caused by the act of God, or some third party or outside interference over which the defendant has no control, then the burden of proof is upon the plaintiff to show that defendant was negligent in failing to anticipate, foresee or avoid such act of God, etc. Hurck v. Railroad, 252 Mo. 39; Davis v. Railroad, 89 Mo. 350; Evans v. Railroad, 222 Mo. 450; Turner v. Haar, 114 Mo. 346; Wolf v. Express Co., 43 Mo. 421; Read v. Railroad, 60 Mo. 206; Sawyer v. Railroad, 37 Mo. 241; Reeves v. Railroad, 10 U. S. (Wall.) 189, 77 U. S. 176; Hite v. Railway Co., 130 Mo. 140. (b) Said instruction is further erroneous in permitting plaintiff to recover on a presumption after all the facts are in, because presumption always gives way to facts. Authorities supra. (4) Instruction 3 is erroneous wherein it says: "And in all you should give him such a sum as you may find and believe from the evidence will be a fair and reasonable compensation to the plaintiff, not to exceed, however, the sum of $85,000." This is a suggestion on the part of the court that the jury should give a large sum, and where the full amount asked for is given, as in this case, such instruction is erroneous. Stidd v. Railroad, 236 Mo. 382; Lessenden v. Railroad, 238 Mo. 247; Applegate v. Railroad, 252 Mo. 173; Kenney v. St. Ry. Co., 261 Mo. 97; Gaty v. U. Ry., 227 S. W. 1041; Vaughn v. Hines, 206 Mo. App. 425; Rooker v. Railroad, 215 Mo. App. 481. (5) The court erred in refusing to instruct for defendant that "there is no testimony in this case that the wreck in question and the plaintiff's injury therefrom was caused by rotten or defective piling in the bridge where the wreck occurred and you cannot find for the plaintiff upon that theory of the case." Peterson v. United Ry. Co., 270 Mo. 67; DeWolfe v. D. G. Co., 240 S. W. 1095. (6) The verdict is so grossly excessive as to clearly show that it is the result of passion, partiality and prejudice on the part of the jury, accelerated by sympathy for

the plaintiff. Where the verdict is so excessive as to shock the judicial conscience of the court and is clearly the result of either passion, partiality or prejudice on the part of the jury, the appellate court will; in the exercise of its inherent power, reverse the judgment. Trowbridge v. Fleming, 269 S. W. 617; Lessenden v. Railroad, 238 Mo. 247; McQuary v. Railway Co., 269 S. W. 605; Crockett v. Railway Co., 243 S. W. 908; Jones v. Railway Co., 287 Mo. 64; Laughlin v. Railway, 275 Mo. 459; Hart v. Railway Co., 264 S. W. 902; Richardson v. Railway Co., 288 Mo. 258; Brock v. Railroad, 305 Mo. 502; Hurst v. Railway, 280 Mo. 566; Foster v. Davis, 252 S. W. 433; Varley v. Railway, 240 S. W. 218.

*Sizer & Gardner* and *C. R. Cravens* for respondent.

(1) Defendant's demurrer offered at the close of the case was properly overruled, as this is a passenger case wherein *res ipsa loquitur* doctrine has its peculiar application; and in such case the issue of negligence is always a question for the jury. Gibson v. Wells, 258 S. W. 1; Anderson v. Railroad, 290 Mo. 8; Brown v. Railroad, 256 Mo. 522; Cecil v. Wells, 259 S. W. 844; Railroad v. Irving, 234 Fed. 562.; Trowbridge v. Fleming, 269 S. W. 610. (2) Before defendant can relieve itself from liability under the prima-facie case made by plaintiff, it must prove to the satisfaction of the jury that the wreck and resulting injury was caused solely by the act of God, or some cause over which it had no control, and which, by the exercise of the highest degree of care, it could not have anticipated, foreseen, or avoided. Price v. Railroad, 220 Mo. 434, 456; Lemon v. Chanslor, 68 Mo. 456; Hipsley v. Railroad, 88 Mo. 352; Moran v. Railroad, 232 S. W. 1111; Trowbridge v. Fleming, 269 S. W. 610. (3) If defendant was guilty of any negligence which concurred with an extraordinary rainstorm to cause the fall of the bridge and consequent wreck, the defendant is liable to plaintiff; and plaintiff's second instruction properly declared the law. Applegate v. Railroad, 252 Mo. 198; Sluder v. Railroad, 189 Mo. 138; Benton v. St. Louis, 248 Mo. 98; Harrison v. Light Co., 195 Mo. 623; Hickman v. Union Electric Co., 226 S. W. 575; Sandy v. Railroad, 235 Ill. 194; Railroad v. Cains, 37 Tex. Civ. App. 531; Ellett v. Railroad, 76 Mo. 518; 10 C. J. 908-909-957. (4) Being a *res ipsa loquitur* case, it was not error to hypothecate a recovery on presumption of negligence after the testimony was all in and the facts were fully before the court and jury. Trowbridge v. Fleming, 269 S. W. 610; Gibson v. Wells, 258 S. W. 1; Brown v. Railroad, 256 Mo. 522; Anderson v. Railroad, 290 Mo. 1; Price v. Railroad, 222 Mo. 535. (5) Defendant's rule requiring conductors and enginemen to make careful inquiry at all stopping places, of the extent and severity of storms, and to make extra stops for such purpose, was admissible. Also its rule providing that during heavy storms bridge

and track foremen must detail their forces to watch the road and take every precaution to prevent accidents, was admissible. Foster v. Railroad, 235 S. W. 1070; Hunt v. Railroad, 259 S. W. 481; Railroad v. Cains, 84 S. W. 682; Crowley v. Railroad, 204 Mass. 241; Grady v. Railroad, 169 Fed. 400; Railroad v. Carr, 84 S. W. 682. (6) The testimony of witnesses Smith and Cooper as to statements made by defendant's conductor and foreman was competent. Section Foreman Ryan having testified that he had not reported this bridge as defective, it was competent to contradict such testimony by proving statements made by him on this occasion, that the bridge had been reported by him as unsafe. Smith v. Railroad, 279 Mo. 173; Hartman v. Fleming, 264 S. W. 873; Gordon v. Railroad, 222 Mo. 516; Schloemer v. Transit Co., 204 Mo. 99; Mullin v. Transit Co., 196 Mo. 572; Spohn v. Railroad, 122 Mo. 18, 101 Mo. 454; Kramer v. Company, 263 S. W. 870. (7) It was competent for plaintiff to prove not only that the bridge was defective, but that appellant had notice thereof through reports made to it by its section foreman, Ryan. Hence such matters were material and the impeachment of Ryan thereon was proper. 1 Wigmore on Evidence, p. 435, sec. 1003. (8) But independent of the impeachment feature, statements made by witness Ryan were admissible as tending to show knowledge on his part that the bridge was defective and that same had been reported, as when this testimony was offered it had already been shown that the bridge was defective and the piling therein were rotten. Yarbrough v. Wisconsin Lbr. Co., 211 S. W. 713; Phillips v. Railroad, 211 Mo. 419; McDermott v. Railroad, 87 Mo. 299. (9) Instruction 3 on the measure of damages is not erroneous in that it refers to the amount sued for, and did not constitute reversible error. Moran v. Railroad, 232 S. W. 1111; Lessenden v. Railroad, 238 Mo. 247; Pope v. Terminal Ry. Assn., 254 S. W. 47; Gaty v. Railroad, 286 Mo. 520. (10) "The most reliable rule for guidance of an appellate court in determining whether a verdict is excessive is that, if sustained by substantial evidence it will not be disturbed, unless the amount is such as to shock the judicial conscience, or, there are indications that the jury were swayed by passion, prejudice, or in some way unduly influenced." Moran v. Railroad, 275 Mo. 472; Gaty v. Railroad, 251 S. W. 68; Gordon v. Railroad, 222 Mo. 516; Adams v. Railroad, 100 Mo. 569. (11) The mere amount of the award constitutes no evidence of passion or prejudice. Beall v. Railroad, 228 S. W. 834; Cook v. Globe Printing Co., 227 Mo. 471; Brohammer v. Logger, 194 S. W. 1072. (12) The purchasing power of a dollar today is much less than it used to be. Hurst v. Railroad, 280 Mo. 566; Duffy v. Railroad, 217 S. W. 883; Gaty v. Railroad, 255 S. W. 61; Shields v. Railroad, 264 S. W. 890. (13) It is the law of this State as announced by the decisions of this court, in a personal injury case, to fully compensate plaintiff

315 Mo.—63.

for the *pecuniary* loss sustained, and in some degree for the suffering endured. Taylor v. Railroad, 279 S. W. 121. (14) The verdict is not excessive. Meeker v. Union E. L. Co., 216 S. W. 923; Skinner v. Davis, 271 S. W. 992; Hughes v. Railroad, 274 S. W. 703; Evans v. General Explosives Co., 239 S. W. 487; Mattice v. Terminal Ry. Assn., 270 S. W. 306; Railroad v. Flechtner, 300 Fed. 318; Railroad v. Combs, 250 S. W. 714; Zibbell v. Railroad, 116 Pac. 613; Railroad v. Ford, 275 S. W. 463; Texas Pipe Line Co. v. Johnson, 275 S. W. 329; McKeon v. Railroad, 127 Atl. 34.

RAGLAND, P. J.—This is an action against a carrier for personal injuries to a passenger, alleged to have been caused by its negligence. The negligence is charged in the petition in the following language:

"Plaintiff states that the defendant failed and neglected its said duties, so that by reason of such negligence plaintiff was injured in the following manner and particulars, to-wit:

". . . On the early morning of September 1, 1922, at about 3:50 A. M., when defendant's said passenger train No. 805, carrying plaintiff therein as a railway postal clerk, reached and ran upon a certain trestle near Starland, in —— County, Missouri, on account of the carelessness and negligence of the defendant, its agents, servants and employees, said south-bound passenger train was permitted and allowed to become derailed and wrecked, and said trestle was permitted, allowed and caused to collapse under said train, thereby derailing same, and the coaches, including the mail car in which plaintiff was riding, were thereby caused, permitted and allowed to be thrown and hurled from said track and trestle with great force and violence. . . . and the derailment of said train and mail car, and the striking thereof on the ground below said trestle, was so violent and severe that plaintiff was hurled and thrown towards the end of said mail car, and at and against the sides thereof, and iron bars and other fixtures and appurtenances therein, and that great quantities of mail and other heavy objects were thrown at and against and upon the plaintiff and he was buried beneath the same, so that then and thereby plaintiff was severely bruised and injured."

The answer, so far as material, is as follows:

"Defendant . . . admits that it is a railway corporation, as pleaded in plaintiff's petition, and that it is the owner of, and engaged in the operation of, the line of railroad as set out in said petition, and was at the time and place in question operating its passenger train as a common carrier, as pleaded by plaintiff; admits that at the date mentioned in plaintiff's petition the plaintiff was in the employ of the United States Government in the capacity of a

railway postal clerk, and as such operated on defendant's passenger train, as alleged in plaintiff's petition; admits that while the plaintiff, as an employee of the United States Government in the capacity of mail clerk, was on defendant's passenger train aforesaid, there was a wreck of said passenger train, and in which plaintiff was injured, but defendant denies that said wreck and injury to plaintiff aforesaid were caused by any negligence or carelessness whatever on the part of defendant, its agents, servants or employees, as pleaded in plaintiff's petition; and further answering, denies each and every other allegation, averment and statement in plaintiff's petition contained, . . . that there was no negligence on the part of the defendant, either in the construction or maintenance of said bridge or trestle, or in the equipment and operation of said train; but defendant alleges and avers that said wreck occurred, as alleged in plaintiff's petition, about 3:50 A. M.; that shortly before and in the immediate vicinity of said trestle, and of the territory drained by the stream over which said trestle spanned, there was an unusual, unprecedented, extraordinary rainfall; that it occurred at the time of night aforesaid and was such an unprecedented and extraordinary flood as to cause a precipitation of said flood water so rapidly and so forcibly and of such an amount as to destroy and wash out a part of the supports, bents and structures of said bridge, and at such a time in the night and so near to the time the train attempted to cross over the said bridge that the defendant, its servants and employees did not know, and had no reason to suspect that a part of said bridge had been destroyed; and that by reason thereof, said bridge or trestle gave way as the train attempted to cross same and caused the wreck in question; but defendant avers that same was not caused by any act of negligence or carelessness whatever on the part of the defendant, its servants or employees, but was caused by an act of God.''

On the trial below plaintiff offered evidence in support of the allegations of the petition, namely, that the mail car in which he was being carried by defendant was derailed and wrecked and he injured in consequence thereof—the principal part of the proof going to the extent and nature of the injuries suffered. Having made this proof plaintiff rested.

The evidence offered by defendant to rebut the inference of negligence arising from plaintiff's proof tended to show the following facts:

On defendant's line of railroad from St. Louis to Memphis, Tennessee, ninety-seven miles from St. Louis, there is a bridge or trestle which carries its tracks across a deep ravine. The place is known as Starland. The bridge structure was described by defendant's chief engineer as follows:

''This model represents a pile trestle, which was the type of bridge in use at that particular place. A pile trestle is one in which the

principal supports are piling. They are driven in bents. A bent is a cluster of pile driven side by side at right angles to the track, a standard even distance apart, lengthwise of the track. The standard distance is fourteen feet, center to center.

"There are eleven bents, or ten panels, the space between the bents being called panel. The trestle was 138 feet from end to end. Some of the bents were not quite fourteen feet centers; they were driven a little closer than fourteen; the piling are driven side by side, as represented in this model, by a steam pile driver that is propelled along the track. . . .

"These bents have placed on top of them a cap which is a stick of timber fourteen inches square and fourteen feet long; through that cap a drive bolt goes down into the top of each pile; the bents are braced together to make them stiff and stable by what is termed 'sash braces,' which are placed, usually, about halfway between the cap and the ground line, at right angles to the piling, and bolted through; three-fourths-inch bolts; iron bolts; all bolts being iron in this structure. They have other sway braces . . . above and below the usual brace, these braces being three by ten long leaf yellow pine timber, and bolted through the pile. Then there is a line of strut braces to stiffen the bent in the center; these are six by eight timbers, and are bolted to the pile at a distance—the top of the cap is placed, a line of stringers on each side supporting the rails, each line of stringers—being three stringers under a rail—eight by sixteen inches in diameter and twenty-eight feet long. The stringers lap over two bents, and by placing one short stringer on the first bent in the middle it makes what is termed a lap joint over each lap. There is a line of these stringers, three on a side, under each rail. On top of them is placed the bridge ties; they are six by eight by nine feet long, spaced one foot centers. That makes them closer together than the ordinary track ties."

The bents were numbered from north to south. The ravine was somewhat "V" shaped. The depth to which the several bents were driven in the ground were as follows: No. 1, 26 feet; No. 2, 24 feet; No. 3, 22 feet; No. 4, 17 feet; No. 5, 10 feet; No. 6, 17 feet; No. 7, 20 feet; No. 8, 22 feet; No. 9, 22 feet; No. 10, 24 feet; and No. 11, 26 feet. Bents 5 and 6, which were in the center of the ravine, were driven to solid rock. The bridge was built according to standard trestle plans approved by the American Railway Engineering Association. The life of such a bridge is ten years; this one was built in 1918. An inspection of it on August 10th, twenty days before the wreck occurred, disclosed that the timbers were sound, except some sap rot on their exteriors which did not affect their strength, and the bridge was in good condition.

Defendant's train, 805, which left St. Louis for Memphis on the night of August 31, 1922, and which carried the mail car in which plaintiff was at work in the performance of his duties as a postal clerk, was what is termed an all-steel train. It consisted of an engine and seven cars; express, combination express and baggage, combination mail and passenger, chair car and three pullmans. As it approached and started across the trestle heretofore described at about 3:50 A. M., the morning of September 1st, its equipment was working perfectly in every respect; it was going at the rate of forty miles an hour, a speed well within the maximum prescribed for trains of that character moving over that particular part of the road. When the bridge was reached the track ahead appeared to the engineer to be intact and in its usual position. When, however, the engine had gotten about half way across the ravine the bridge began to go down under it. The momentum of the train carried the engine and the first two cars over to the south bank, where they were derailed and thrown on their sides. When the mail car came to rest the forward end was down in the ravine and the other upon the baggage car, which had been driven under it. Defendant's railroad at the place where the wreck occurred paralleled the west bank of the Mississippi River, and was 225 feet distant from the water's edge. The fall of the ravine from where it was spanned by the trestle or bridge down to the river, as it was on the morning of September 1st, was so great that water would run through it with the rapidity of a mill race. The ravine was the outlet for the water which fell upon a territory of steep river hills, two miles in length by one in width. A local but unprecedented rain fell over this area between midnight and 2:30 A. M., September 1, 1922. Witnesses described it as a cloud burst. Buildings, fences and fruit trees were swept away by the torrents of water; roads were cut to pieces by erosion; and some small cultivated fields were entirely denuded of soil. An inspection of the trestle following the wreck disclosed that the bottom of the ravine had been scoured out down to bedrock. The strip so eroded was about twenty-five feet in width. Bents 5 and 6 were entirely missing; parts of them were found later several miles down the Mississippi River All of the piling but one in bent 7 were broken off.

Members of the crew in charge of train 805 testified that as they came down toward the bridge at Starland there were indications that a light rain was in progress and nothing more. The engineer testified:

"The first rain I noticed that night was about a half mile north of McBride. It was raining just a very light rain as we approached McBride; and the indications were that it had been raining some. McBride is about fifteen miles from Seventy-Six. It rained a little all the way down from the time we hit the rain just north of Mc-

Bride until we got to Seventy-Six (a mile and a half north of the trestle at Starland); not continually, but light showers. I didn't see anything that would indicate a storm or heavy rain. At Seventy-Six I saw indications of rain; there was considerable water standing around the tank there, but that was kind of a low place around the tank and water sometimes flows in there, you know, taking the water spout from the tank. I couldn't say to what extent it had been raining. I didn't notice any heavy clouds, storm clouds, or anything of that nature.''

When the defendant rested, the plaintiff offered further evidence tending to show as follows:

The rainfall as to volume was unusual, possibly unprecedented; but the rain was neither local nor suddenly precipitated. It began raining at about ten P. M., and continued with slight intermissions until about 3 A. M., and it was general as to all southeast Missouri. At Seventy-Six the rain was just as heavy and the manifestations of the storm just as violent as over the territory drained by the ravine. Defendant's foreman having in charge the section in which the trestle was located lived at Seventy-Six; he was up until midnight making out his monthly report; but he made no inspection of the tracks or trestle to ascertain whether either had been, or might be, affected by what others considered a torrential rain. A night operator was on duty at the station at Seventy-Six, and Train 805 stopped there; but the crew made no inquiry as to the extent or violence of the storm and no information was given them with respect thereto. In this connection plaintiff read in evidence over defendant's objection the following rules of the company:

''Conductors and enginemen will make careful inquiry at all stopping places, and when thought advisable, make extra stops to ascertain the extent and severity of storms, taking no risk. In case of doubt as to safety of proceeding they will place their trains upon the siding and remain there until certain it is safe to proceed.''

(Bridge and track foreman) ''during heavy storms must detail his forces to watch the road and take every precaution to prevent accident.''

The earth so-called into which the piling of bents 5 and 6 were driven was nothing more than sand and sediment deposited from time to time by the overflow of water of the Mississippi River; good engineering required that piling driven through such unsubstantial material be anchored to the rock by concrete or other means. The place under the bridge which was eroded was not more than three or four feet in either depth or width. The broken piling of bent No. 7 showed that some of them were decayed all around to a depth from two to four inches from the exterior, and that others were rotten through and through.

After plaintiff rested a second time the defendant offered further evidence tending to negative that last introduced by plaintiff. Among other witnesses called at this time was Ryan, the section foreman. He testified that he made observations as to the rain from time to time from ten o'clock until two and found that there was no excessive rain in that locality (at Seventy-Six) or anything to cause any alarm whatever.

Other evidentiary matters will be noted if necessary in the course of the opinion.

At the close of the evidence the defendant asked the court to give an instruction in the nature of a general demurrer to the evidence, which was refused. It then requested the court to instruct the jury: (a) that there was no evidence that the wreck, and plaintiff's injury therefrom, was caused by rotten or defective piling in the bridge; (b) that there was no evidence that the bridge where the wreck occurred was negligently constructed or maintained; and (c) that there was no evidence that the train on which plaintiff was a passenger was negligently managed or operated. These requests are termed special demurrers to the evidence. They were all refused. The court gave at plaintiff's instance three instructions. Instruction 1 was as follows:

"The court instructs the jury that if you shall find and believe from the greater weight of the evidence that the defendant was engaged in carrying and transporting the United States mails, and that on the night of August 31, 1922, the defendant, at St. Louis, Missouri, received and accepted the plaintiff as a railway postal clerk in one of the mail cars on its train No. 805, and that plaintiff thereupon took passage upon said train for his destination at Memphis, Tennessee, and entered upon the performance of his duties as a postal clerk in said car, then you are instructed that in this case the plaintiff should be regarded as a passenger upon said train; and the court instructs you that the defendant owed to the plaintiff the duty under the law to exercise the highest degree of care in the running and operating of its locomotives, cars and trains, and in the maintenance and operation of its track and roadbed, and to safely transport the plaintiff to his destination, and such high degree of care must be the highest care practicable among prudent, skillful and experienced men in the same kind of business; and if you find that the defendant, its agents, officers, servants or employees failed to exercise such high degree of care, then the defendant was guilty of negligence and is responsible for all damages, if any, resulting to the plaintiff from such negligence, if any.

"And if you further find and believe from the evidence that the mail car of said train in which the plaintiff was being transported was suddenly derailed or hurled from the track at or near Starland, in Perry County, Missouri, on the early morning of September 1, 1922,

before the plaintiff reached his destination, and without fault on his part, and that the plaintiff was thereby injured as a result of such derailment, then the presumption is that such derailment or wreck of said mail car and train was occasioned by the negligence of the defendant, its agents, servants or employees, and the burden of proof is cast upon defendant to rebut this presumption of negligence from all the facts and circumstances in evidence, or to prove that the derailment of said mail car and injury to the plaintiff were occasioned by an inevitable accident or by some power or force over which defendant had no control, and which it could not reasonably anticipate, foresee or avoid, such as the act of God, as herein defined; and unless defendant has so shown your finding and verdict must be for the plaintiff.''

Instruction 2 told the jury, in substance, that although the track and roadbed at the scene of the wreck were impaired and washed out by an unusual and extraordinary rain storm, yet if employees of the defendant in charge of the maintenance of the track and those in charge of the running and managing of the train, knew, or by the exercise of that high degree of care such as practical and skillful men exercised under like circumstances could have known or become aware of, the storm and its probable effect in time to have avoided the derailment of the train, and failed to do so, then the defendant was guilty of negligence and was not entitled to a verdict on its defense of an act of God.

Instruction 3 on the measure of damages concluded as follows:

''And in all you should give him such a sum as you may find and believe from the evidence will be a fair and reasonable compensation to the plaintiff, not to exceed, however, the sum of eighty-five thousand dollars.''

The jury returned a verdict for plaintiff, assessing his damages at $85,000, and judgment was given accordingly. Defendant brings the cause here on appeal.

Appellant assigns as error: (1) The refusal of its general demurrer to the evidence; (2) the giving of plaintiff's Instructions 1 and 2, and the refusal of defendant's special demurrers to the evidence; (3) rulings of the court as to the admissibility of certain evidence; and (4) the giving of plaintiff's instruction on the measure of damages, and excessiveness of the verdict.

I. On the demurrer appellant's contention is this: Plaintiff made a prima-facie case, or a case based upon a *presumption*, in proving (a) he was a passenger, (b) the train wreck and (c) **Presumptions: General and Special Negligence.** that he was injured. Defendant then showed that there was no negligence in (a) the equipment of the locomotive and train, (b) the operation and speed of the train, and (c) the construction, maintenance and

inspection of the bridge; but that the wreck was caused by *vis major,* an unprecedented rainfall. Defendant having shown the facts, the presumption arising from plaintiff's proof disappeared and it was then incumbent upon him to come forward with proof of specific acts of negligence, and this he failed to do. As stated the proposition assumes that plaintiff failed to offer any evidence tending to show specific negligence. For present purposes we will treat that assumption as justified by the record.

Appellant's counsel suggest that this court has ruled both ways on the question presented by the demurrer, and they intimate that it is our duty to settle "the vexatious question of 'presumption' which keeps rising before the courts." We shall not undertake a task so impossible of fulfillment; we shall be entirely content if we are able to offer suggestions which will to some extent clarify our rulings.

Presumptions, in so far as they relate to the "burden of proof." or the "burden of evidence," are rules of law; some of them are based on inferences of fact; some are not. Let us illustrate: The holder of a promissory note, alleged to be a holder in due course, brings suit on it against the maker. The defendant admits the execution of the note, but sets up as a defense that he was induced to execute it through certain fraudulent representations made by the payee, and that plaintiff took the note with full knowledge of the fraud. The burden of proof is upon the defendant to establish his affirmative defense; he offers evidence as to fraud only, and thereby makes a prima-facie case because such evidence not only tends to show the fraud, but creates the presumption that the plaintiff took the note with notice of it. If then the plaintiff comes forward with evidence unequivocably showing that he took the instrument without any knowledge of the infirmity and in good faith, the presumption disappears and the defendant must then make proof of specific facts from which notice or bad faith can be inferred, or else suffer a directed verdict against him. This because the presumption in such cases does not rest upon an inference of fact. It is a rule of procedure and nothing more. [Downs v. Horton, 230 S. W. 103.]

Again: A is run down and injured through the negligence of B while driving C's automobile. In a suit against C to recover for the injuries, A offers evidence tending to show that the automobile was owned by C and that B was C's regularly employed chauffeur. From this proof the presumption arises that B at the time of inflicting the injuries on A was acting within the scope of his employment by C. This presumption is likewise a mere rule of procedure. After a certain showing has been made by plaintiff it shifts the burden of evidence to the defendant, who has peculiar knowledge of all the facts. It is true that in Guthrie v. Holmes, 272 Mo. l. c. 233, it is referred to as a presumption of fact, but the ground of the decision in that

case is: that proof of the ownership of an automobile involved in an accident and its operation by one in the general employment of the owner does not, without more, give rise to an inference of fact that the operator at the time of the accident was acting within the scope of his employment, or that if such an inference can be drawn, it is one so frail and tenuous as not to amount to substantial evidence. The opinion quotes approvingly from Berry on the Law of Auto mobiles the following language, which speaks for itself:

"The presumption in question is rather a frail thing. It is unlike an inference that arises upon the proof of certain facts, and which is necessarily true if the facts are true. It rests upon the facts that the automobile was owned by the defendant and that the chauffeur who was operating it was in the general employment of the defendant; neither one nor both of which actually tends to prove that the chauffeur was engaged in the owner's business."

The rule of law applicable in such cases as this—call it presumption of negligence, or *res ipsa loquitur*—does not purport to relieve the plaintiff of the burden of proving in the first instance that defendant was negligent; it merely relieves him of the necessity of alleging and proving *specific negligence*. From plaintiff's evidence in chief in the case at bar, tending to show: that he was a passenger on defendant's train, that the train was wrecked and that as a consequence thereof he was injured, a substantial inference of fact arose, namely: that defendant had in some respect failed to exercise that high degree of care which under the law it was incumbent upon it to exercise. The facts so put in proof were therefore *evidence of negligence* on the part of the defendant. When defendant introduced its evidence tending to show that it was not negligent in any respect, but that the wreck of its train was caused solely by an act of God, plaintiff's evidence did not vanish or disappear. It was still in the case; and it was sufficient to support an affirmative finding on the issue of negligence or no negligence. Plaintiff's evidence tending to show negligence and defendant's tending to show the contrary, made as of course a case for the jury.

We are unable to agree with the insistence of appellant's counsel that all the evidence in the case showed that an unprecedented rainfall was the sole cause of the wreck. Plaintiff's and defendant's witnesses did fully agree as to the character of the rain storm, but there was substantial evidence in the case tending to show that in the exercise of due care defendant's employees would have discovered the condition of the bridge caused by the storm in time to have avoided the wreck.

II. (1) It is claimed that plaintiff's Instruction 1 was erroneous because: "It placed the burden of proof upon defendant, not only

to show that the wreck was caused by an act of God, but also that the defendant could not reasonably anticipate, foresee or avoid such act of God.''

A carrier is not an insurer of the safety of its passengers; it is liable only for its negligence. The petition in this case alleged that the defendant was negligent; the answer contained a denial, but set up no affirmative defense, pleading an act of God merely nega- tived the allegations of negligence. Negligence being affirmed by the plaintiff and denied by the defendant, the burden of proof rested upon plaintiff. If the rule of law which places upon the defendant in actions of this character the burden of going forward with the evidence after the plaintiff has made a prima-facie case, showing if it can that it is entirely free from all imputations of negligence, were a mere rule of procedure, then when all the evidence is in it would be proper to instruct the jury that the burden is upon the plaintiff to show by the greater weight of the evidence that the defendant was negligent. For the burden of proof as distinguished from the burden of evidence does not shift, it is said. [Griffith v. Casualty Co., 253 S. W. 1043; Downs v. Horton, 230 S. W. 103.] But in Price v. Railway, 220 Mo. 435, such an instruction was offered by defend- ant, and this court in approving the action of the trial court in refus- ing it, said at page 463: ''Such an instruction has no place in a case where the doctrine of *res ipsa loquitur* is applicable. It destroys every vestige of the doctrine of presumptive negligence.'' In the same case an instruction of the same purport as plaintiff's Instruction 1, as to the burden of proof, was after an elaborate review of the decisions in this State, unqualifiedly approved. It appears therefore that in this State the rule is firmly established, that where a passenger with- out fault of his own suffers injury by the derailment or wrecking of the vehicle of carriage, the burden is upon the carrier ''to establish that there has been no negligence upon its part and that the injury was occasioned by an inevitable accident or by some cause which hu- man precaution and foresight could not have averted.'' Logically such a rule cannot be merely one of procedure; it must be regarded rather as one of substantive law, adopted for the protection of pas- sengers. It has been followed so long that its enforcement must now be considered a part of the public policy of the State.

The burden of showing that it could not by the exercise of due care have discovered the condition of the bridge caused by the storm in time to have stopped the train and averted the wreck, was a part of the burden which the law cast upon the defendant after the plain- tiff had made a prima-facie case, and which it was thereafter bound to carry throughout the remainder of the trial. [Trowbridge v. Fleming, 269 S. W. 610; Brown v. Railroad, 256 Mo. 522; Price v. Railroad, supra.] Defendant's Instruction 6, given by the court, embodying a contrary view was erroneous. Not only that but it

seems to be inconsistent with plaintiff's Instruction 1, which as we have seen was a correct one. Appellant is in no position to complain of the conflict. [Moran v. Railroad, 232 S. W. 1111.]

What has been said disposes of appellant's criticism of plaintiff's Instruction 2.

(2) The instructions, termed special demurrers to the evidence, asked by defendant, were not demurrers at all. They were requests that the court declare as a matter of law that defendant's evidence was sufficient to acquit it of any negligence in respect **Special** to the construction and maintenance of the bridge and **Demurrers.** the management and operation of the train. They were properly refused. [Brown v. Railroad, supra, l. c. 536.]

III. (1) The rules of the defendant read in evidence by the plaintiff were admissible as evidentiary facts tending to show a want of due care. [Foster v. Railroad, 235 S. W. 1070.] **Rules.** If competent for any purpose it was not error for the trial court to admit them. If the defendant desired an instruction limiting their legal effect, it should have asked it.

(2) Ryan, who was in charge as foreman of the section in which the bridge was located, was a witness for defendant. Plaintiff asked him on cross-examination whether immediately following the accident he had not stated in the presence of certain persons that he had reported the bridge as in bad shape. He denied having **Foreman's** made any such statement, and plaintiff subsequent-**Knowledge.** ly, over the defendant's objection, offered evidence tending to show that he had. This evidence appellant insists was incompetent: It was incompetent to prove that the bridge was in an unsafe condition, because hearsay; it was incompetent for the purpose of impeachment, because it related to an immaterial matter. There was evidence in the case tending to show that some of the piling were more or less rotten and the strength of the bridge diminished to that extent. If defendant had knowledge of that condition in time to have made renewals before the wreck occurred, that was a material fact. Its foreman's knowledge in that respect was its knowledge. Evidence tending to show such knowledge on the part of the foreman was therefore competent, whether offered directly for that purpose or for the purpose of impeachment. [Phillips v. Railroad, 211 Mo. 441; McDermott v. Railway, 87 Mo. 299.]

(3) When Phillipson, the conductor who was in charge of the train, was on the witness stand, he was asked on cross-examination whether shortly after the wreck and while he and others were walking from the station at Seventy-Six to the scene of the wreck, and in response to a remark made by Ryan that he (Ryan) had

twice reported the bridge as unsafe and in bad shape, he stated: "Don't say anything about it at the wreck." He **Impeachment:** denied having made the statement. Plaintiff then **Immaterial** called a witness who testified that he did. Appel-**Matter.** lant insists that this testimony was inadmissible because offered for the purpose of impeaching Phillipson as to an immaterial matter. If the witness advised the section foreman to say nothing about his having reported the bridge unsafe, it tends to show that he had such an interest in the subject-matter of the action that he had, at one time at least, desired to conceal the facts. Such interest on the part of a witness is not an immaterial matter. [Jablonoswki v. Mfg. Co., 312 Mo. 173, 279 S. W. 89.]

(4) Complaint is made that certain hypothetical questions propounded to witnesses by plaintiff were not based on the evidence in the case. These contentions of appellant are not supported by the record.

IV. When the mail car left the rails plaintiff was thrown headlong through the air, and then buried under sacks of mail, tables and iron racks. After about five hours he was dug out, put on a cot and conveyed to defendant's hospital in St. Louis, where he **Verdict.** remained for a period of six months. He sustained fractures of the bones at three joints: right shoulder, left hip and right ankle. The usual dressings, splints and casts were used to reduce the fractures, but without avail. Surgical operations were deemed necessary, and he underwent three. On May 23, 1923, he was examined by Dr. H. C. Bohrer, a physician and surgeon, who described his then physical condition as follows:

"On the right shoulder there was a scar some seven inches long, post-operative in appearance. The motion of his shoulder was limited in all directions. Raising the arm away from the body, or abduction, limited to about forty-five degrees. The right arm was about one inch shorter than the left arm. The left hip showed a scar eight inches long, post-operative in appearance; the muscles around the left hip were flabby and showed some wasting. Motion of the left hip limited, voluntary motion being very slight, passive motion was very much limited. The left knee was larger than the right, ankylosed or stiff, flection being possible to about twenty degrees. The left leg was about one and three-quarters inches shorter than the right. The right ankle there was a bony protuberance, palpable, with a scar about two inches long on the outer side. This appeared to be a post-operative scar. There was audible and palpable cracking in the ankle joint on passive motion. Motion is limited in that joint. The foot was turned inward. . . . It is my opinion that the injuries are permanent. . . . The left hip, the position of the fragments make that hip absolutely useless. The po-

sition it is in, he will never have the proper motion of that hip joint. The right shoulder injury is permanent. There is a loss of the head of that bone, roughening of the cavity. Now, taking into consideration the two injuries as well as the right ankle, I believe the man is permanently disabled; I don't believe the hip or shoulder will ever resume its normal function.

"At present he is one hundred per cent disabled toward performing work and engaging in a livelihood."

Dr. Bohrer testified that plaintiff had been under his care since he first examined him up to the time of the trial, January, 1924, and that there had been but little change in his condition.

It was further shown that plaintiff sustained an injury to his right eye, whereby the vision as to that eye was reduced forty per cent; an injury to his right ear, which impaired his hearing in that ear to the extent of twenty-five per cent. The action of his heart had become somewhat accelerated; and an enlargement of the thyroid gland had taken place.

Plaintiff at the time of the trial could move around some with the aid of crutches, but not without pain. The use of a crutch caused pain in the right shoulder, and he suffered pain if he bore any weight on either leg. He could not sit down or get up without assistance. His wife dressed and bathed him. He was weak, extremely nervous and unable to sleep at night.

At the time of his injuries plaintiff was thirty-seven years of age; prior to that time his health had been perfect. He had been in the railway mail service as postal clerk since he reached his majority; he had had no training that would fit him for any other vocation. He had reached the highest rank as postal clerk, and was receiving a salary of $2300 a year. Following his injuries he was discharged from the service.

Notwithstanding the evidence shows that plaintiff has been totally disabled, so far as earning a livelihood by manual labor is concerned, and has suffered, and will suffer, pain, mental and physical, the jury's assessment of his damages is clearly excessive. His counsel point out that under the regulations governing the railway mail service he would have continued to earn an annual salary of $2300 until he reached the age of sixty years, when he could have retired on a pension; and that during the twenty-three years of active service alone he would have received approximately $53,000. But the present worth of an annuity of $2300 during the whole of his life expectancy is only about $30,000. In addition to loss of earnings, there are of course other elements to be taken into consideration, such as the suffering endured and to be endured, the extra care and attention he will require on account of his physical helplessness, and the right itself to health and a normal body, which has been destroyed. However, we

are of the opinion that on the whole any sum in excess of $35,000 must be deemed excessive.

An instruction on the measure of damages which fixes a maximum amount which the jury may allow, without disclosing any reason why the court has fixed the maximum at the particular figure named, carries to the minds of the jury a clear implication that the court is of the opinion that the evidence warrants an assessment up to the amount specified. In an action for personal injuries, where many of the elements of damages are intangible, where the extent of the pecuniary loss is necessarily more or less conjectural and where sympathy always operates, such an instruction is especially harmful. Some day this court will no doubt hold that the giving of such an instruction, if followed by an excessive verdict, is reversible error. In the meantime we follow the old precedents in declaring that the error can be cured by a *remittitur*. The judgment of the circuit court is affirmed, on condition that respondent within ten days enter here a *remittitur* in the sum of $50,000 as of the date of the original judgment; otherwise, the judgment is reversed and the cause remanded.

All concur, except *Graves, J.,* absent.