# MARCH, 1930.

KATHERINE BARTLETT, RESPONDENT, v. PONTIAC REALTY COMPANY, A CORPORATION, APPELLANT.—31 S. W. (2d) 279.

St. Louis Court of Appeals.   Opinion filed September 15, 1930.

*Buder & Buder* and *E. E. Schowengerdt* for appellant.

*Paul Koenig, John S. Marsalek* and *Kelley, Starke & Hassett* for respondent.

1244

SUTTON, C.—This is an action to recover damages for personal injuries sustained by plaintiff while in the employ of defendant, as the operator of a passenger elevator, in the Buder Building, located at the northwest corner of Seventh and Market Streets, in the city of St. Louis.

The trial, with a jury, resulted in a verdict in favor of plaintiff for $5,000, and judgment was given accordingly. Defendant appeals.

Plaintiff received the injuries for which she sues through the falling of the elevator she was operating. The accident occurred on September 4, 1926, at about two-thirty or three o'clock in the afternoon. Plaintiff had been in the employ of defendant as operator of the elevator for about a year prior to her injury. Her duties in connection with the elevator were merely as operator. She had nothing to do with the care or maintenance, and knew nothing of the details of the construction of the elevator, or its mechanism. While she was operating the elevator it fell down the shaft from the thirteenth floor of the building to the ninth floor, where it stopped with a violent and unusual jerk, whereby she received the injuries for which she sues. She testified that just before the car fell it was stationary at the thirteenth floor; that she was waiting for a signal from the elevator starter; that the controller she oper-

ated the car with was in the groove of the controller box, which was the proper position to hold the car stationary; that she did not have her hands on the controller at all at the time the car dropped; that the car dropped from the thirteenth to the ninth floor; that she was standing at the time; that it started down so abruptly she did not know what was the matter, but that she felt that the car was falling; that it stopped with such a jolt or jerk it threw her back against the stool she used in the car, and knocked the stool over, that her back, as she fell, struck the stool; that her head hit on the side of the car, and she fell onto the floor of the car; that when she took the car after the lunch hour she noticed that the car was running uneven; that whenever she started it up it would start off slow, and then start off sudden, and when it would stop it would stop with a jolt, shaking all over, and it would stand stationary for an instant and then start again; that this was before the car dropped; that when the car dropped it stopped by itself; that she did not stop it; that before the car dropped she reported its unusual behavior to Mr. Henry Barth, the building manager; that she said to him: "Mr. Barth this elevator is out of order. It is going the same way it did when we fell with the Western Union Telegraph boy. You should report it at once." That Mr. Barth said: "I will;" that she continued to work on the elevator because she thought Mr. Barth was going right away to report its condition to the electrician.

Defendant introduced in evidence plaintiff's deposition, taken some time before the trial, in which she stated her conversation with Mr. Barth, with respect to the unusual behavior of the elevator, as follows: "I said, 'Mr. Barth, this elevator is acting like it did before.' I had an accident once before on the same elevator. I said: 'You should call the electrician, tell him right away.' He said: 'I will.' "

Defendant offered evidence tending to show that there was an ordinary controller in the car for the use of the operator; that by moving the controller the car could be caused to move up or down, or to stop; that the elevator was geared to a speed of four hundred fifty feet per minute; that underneath the car there were brakes which would automatically operate and bring the car to a stop if its speed exceeded four hundred fifty feet per minute.

Thomas J. Doran, called by defendant, testified that he was in charge of the elevators in the building at the time of the accident, and before; that when he heard of the accident he went to the ninth floor and found the car stopped there with the brakes set; that after releasing the brakes he operated and inspected the car and could find nothing wrong with it; that he could not account for the falling of the car except through the careless manipulation of the controlling device by the operator; that if certain functions of the ap-

paratus or mechanism should not be working just right it could cause the car to drop; that the brakes and things not functioning right or dirt getting into the carbons or contacts or something like that, would cause it; that he inspected the elevator daily; that he inspected it on the morning of the accident, and found it working all right and in good condition.

Adam Herman, called by defendant, testified that he was in the employ of defendant, and was on the ninth floor of the building when the car fell; that before the car stopped he heard a crash and then a real hard sudden click, and then the car came, to a stop.

Other witnesses testified for defendant that they each had operated the elevator on the day of the accident, and did not notice anything unusual or wrong about its operation.

The court, at the instance of the plaintiff, gave to the jury instructions Nos. 1 and 2, authorizing a verdict for plaintiff upon presumptive negligence arising under the *res ipsa loquitur* rule. Defendant complains of these instructions here on the ground that the evidence did not warrant the submission of the case under that rule. A like complaint was urged against a like instruction, and ruled against defendant, in Stroud v. Booth Cold Storage Co. (Mo. App.), 285 S. W. 165. In that case, which is almost identical on its facts with the present case, the court said:

"The evidence discloses that the elevator started in an unexpected, unusual, and extraordinary manner, without any apparent reason, and without any fault on plaintiff's part, and, even though this be a master and servant case, we think plaintiff made a prima-facie case under the facts we have above set out entitling him. to invoke the rule of *res ipsa loquitur*. The jury would have a right to infer that defendant was negligent in some respect, and plaintiff would not be required to prove any particular kind of negligence. If plaintiff makes a prima-facie case, and quits at that, then it is up to the defendant to relieve itself of liability, and, if negligence is once shown, or facts from which it may be inferred or presumed, then plaintiff is not required to go further and show that it was some particular kind or character of negligence which caused the injury. It is defendant's duty to show that it was free from negligence."

The opinion in the Stroud case was unsuccessfully attacked in the Supreme Court, by petition for writ of *certiorari,* as being in conflict with controlling decisions of that court.

Defendant insists that since the defendant produced evidence showing that the elevator machinery was in good condition, and that defendant was free from negligence, plaintiff was not entitled to have the cause submitted to the jury under the *res ipsa loquitur* rule. There is no support for this insistence either in principle or authority. The presumption of negligence arising under the *res ipsa lo-*

*quitur* rule is not a mere rule of procedure. The unusual occurrence from which such presumption arises is evidence of negligence. Such presumption is not put to flight by testimony for defendant showing freedom from negligence on its part. [Bond v. St. Louis-San Francisco Ry. Co., 315 Mo. 987, 288 S. W. 777; Murphy v. Tombrink (Mo. App.), 25 S. W. (2d) 133.]

Defendant insists that the *res ipsa loquitur* rule is not applicable because the plaintiff testified relative to the unusual behavior of the car before it fell, thus showing that she knew of the defective condition of the elevator mechanism which caused it to fall, so that it cannot be said that the facts concerning the cause of the fall of the car were peculiarly within the knowledge and power of the defendant. We are unable to see why the showing by plaintiff that the elevator manifested evidences of being out of order before the car fell should deprive her of the benefit of the presumption of negligence arising from this unusual occurrence. It would seem' that such showing ought to strengthen the presumption rather than destroy it. It is settled law that plaintiff is not precluded, by showing some specific acts of negligence, from relying upon the presumption of negligence arising under the *res ipsa loquitur* rule. [Price v. Metropolitan Street Ry. Co., 220 Mo. 435, 1. c. 456, 119 S. W. 932; Stegman v. Peoples Motorbus Co. (Mo. App.), 297 S. W. 189; Briscoe v. Metropolitan Street Ry. Co. (Mo.), 120 S. W. 1162, 1. c. 1164.]

The instructions complained of required the jury to find, as an essential predicate to a verdict for plaintiff on presumptive negligence, that the sudden and unusual descent of the elevator car occurred without the "control cables" being moved, manipulated, or touched by plaintiff. Defendant insists that the instructions were misleading for the reason that the evidence disclosed that there was no cable or cables which could be moved, manipulated, or touched by plaintiff. It is manifest that the term "control cables" was used, instead of "control device or arm," by inadvertence. We do not think, under the facts and circumstances of the case, that this verbal inaccuracy could have misled the jury. The control device or arm used by the operator in controlling the movement of the car was fully described in the evidence, and was constantly referred to during the trial. There was no dispute or issue concerning it. The defendant's evidence tended to show that the sudden dropping of the car could not have happened except by some improper manipulation of the control device or arm by the operator, and it submitted to the jury, by its instruction No. 3, in clear and definite terms, its theory that if the plaintiff by improper manipulation of the "control device or arm" caused the car to fall, she was not entitled to recover. The jury could hardly have failed to understand that the reference in plaintiff's instructions was to the control device or arm described in the evidence and referred to in defendant's instruction.

Defendant makes the further point that the falling of the elevator was not the proximate cause of plaintiff's injury, but that the proximate cause was the presence of the stool over which plaintiff fell, and that plaintiff was guilty of contributory negligence as a matter of law in placing the stool behind her in a position where she was likely to fall over it. In other words, as we understand the defendant's contention, it is that plaintiff should have anticipated that the elevator would fall, and ought to have so placed the stool that she would not fall over it when the elevator fell. Obviously, there is no substance in this contention. The presence of the stool was merely an incident in the causal connection between the defendant's negligence and the plaintiff's injury, contributing merely in a remote way to the injury. It affords no evidence of contributory negligence on the part of the plaintiff.

Defendant also assigns error on the refusal of its instruction in the nature of a demurrer to the evidence. The grounds for this assignment are, (1) that plaintiff did not make out a submissible case under the *res ipsa loquitur* rule, and (2) that the evidence shows contributory negligence on the part of plaintiff as a matter of law. It is manifest from what we have already said that the instruction was properly refused.

Defendant complains of error on the part of the court in permitting plaintiff in questioning one of its witnesses, to make improper use of the witness' deposition. We are satisfied that no improper use was made of the deposition. Aside from this, the only objection made to the use of the deposition in the court below was this: "I object to that manner and use of this deposition." Obviously, this objection was too general to convict the court of error in its ruling thereon.

Defendant complains that the verdict is excessive. Plaintiff testified that she was in a perfect state of health and had never had any illness prior to the accident, except occasional colds; that after the accident she suffered intense pain all over her body, most extremely in the lower parts; that she was highly nervous and could not sleep at night; that she had extreme pain in the lower part of her stomach, and lower organs of the body and back; that the pains in her stomach were so severe that at times after she had called her doctor during the day she would be compelled to call him back later on in the night to give her medicine to ease the pain; that she had awfully severe pains in her female organs; that she was rendered extremely excitable and could not sleep; that she called Dr. Meyer to treat her and was in bed about a month under his care; that during that time he was treating her back, stomach and female organs, and her nervous condition; that she was under Dr. Meyer's care for a year or more; that she was suffering from a retroflexion of the uterus; that at the time of the trial, which occurred three years after the

accident, she still suffered pain in her back and stomach, and suffered terribly with her female organs during her monthly periods, which were irregular, profuse and protracted; that she was able to sleep but very little; that at times she got around four or five hours sleep nightly, but that she was as tired after she got up as she was before she went to bed; that the least little thing excited her; that oftentimes she would forget where she put things, and things like that; that she would forget what she went to the store for, or something like that; that in crossing the streets the automobiles, though they were far away from her, would make her terribly nervous, and she would sometimes think that they were right upon her; that she suffered from terrible headaches; that these headaches were of two or three days' duration; that about a year previous to the trial she had attempted to work; that she took a position at a clothing store, but that due to her condition she had to lay off a great deal, and her employer got tired of it, and she lost her position; that the headaches and nervous trouble, the difficulty in her menstrual periods, and the pain in her female organs, stomach, back and abdomen, which she suffered at times up to the time of the trial, were the same kind of pains that she had immeidately after the accident; that the lower part of her back was injured in the accident; that she judged her kidneys were injured; that she did not know positively; that she found that she could not sit any length of time, or stand up, or anything like that.

Dr. Harry H. Meyer, called by the plaintiff, testified that he was called to treat plaintiff shortly after the accident; that he found that she had bruises on her right hip which pretty well covered the entire hip; that on examination he found extreme soreness over the abdominal cavity and pelvic organs; that she was suffering from nervous shock and inability to sleep at night, and was addicted to intense headaches; that upon making a pelvic examination he found the uterus was enlarged very much, and the ovaries and tubes swollen; that the uterus was very sensitive and retroflected, that is, turned backward and lying against the rectum; that both were very sore; that the soreness was so extreme that he could hardly examine her properly; that he took the precaution to test the discharge that was present, which he thought might possibly contain gonorrheal germs, but that he found that it did not; that he found the discharge negative, but very foul; that he made sixteen calls to the plaintiff's home from the time of the accident to October 3, 1926, and always found her in bed; that she stated that she could not do otherwise than remain in bed; that he treated her condition, prescribed medicine to ease her pain, and sedatives to quiet her and induce sleep at night; that from October 8th, to December 17, 1926, she made numerous calls at his office; that twice during that time he was called to her home on account of attacks of acute pain which she suffered in

her female organs and abdomen; that she remained in bed most of the time until the end of the year, in accordance with his instructions; that by treatment and exercise the malposition of the uterus was corrected, the congestion relieved, and a general condition approaching normal finally resulted; that the abnormal conditions from which she suffered could have been caused by trauma or accident; that a shock of the nervous system, produced by trauma, usually takes quite some time before relief comes, but that it usually comes in course of time; that a sudden jerk, jar or blow could produce an injury to the soft tissues of the back, and of the abdomen and intestines, which it would be impossible for the physician to discover by objective symptoms; that plaintiff complained about the lower end of her breast bone being sensitive and causing her considerable pain, but that he was unable to find any fracture or sprain of the bone in that region; that on December 22, 1927, the last visit plaintiff made to his office, he could find no cause for the pain which plaintiff still complained of in her pelvic organs, outside of some slight inflammation; that she still complained of irregular painful menstruation. and abdominal pains; that they could have been produced by different causes, and could have been the result of the injury.

Dr. M. W. Hoge, called by plaintiff, testified that in May, 1929, a few days before the trial, he examined plaintiff, principally with reference to her nervous condition; that he had her to first stand with her feet together and her eyes closed, and he noticed that she was distinctly unsteady in that position, swaying from side to side; that he then had her slip off her shoes so as to stand flat-footed on the floor and attempt to stand on one foot, with her eyes open; that she was very decidedly unsteady, and would sway and almost fall in making that test; that there was some tremor in the tongue when she put it out, and of her hands when she held them out; that this tremor was not extreme, but that it was sufficient to be observed; that her deep reflexes were all very much over active, indicating a nervous disturbance; that there was evidence of tenderness and withdrawal from pressure in manipulating and pressing on the scalp; that there was the same evidence of tenderness in pressure over the spine between the shoulder blades; that there was tenderness on pressure over the large nerves of her arms; that there was tenderness on pressure over both sciatic nerves; that he also observed in taking her history that she was often very slow in recalling details about her history as to the date when a certain thing happened; that things which should be of importance to her she was slow to remember, and other things less important she seemed to have no trouble in remembering; that in his opinion these conditions could have been caused by accident or trauma; that such conditions do frequently result from a person being in an accident; that he diagnosed her condition as traumatic neurasthenia, a functional disorder of the

nervous system, and as such theoretically recoverable; that some patients recover from this disorder and others do not; that it was his judgment, however, that in a case of several years standing, without any recent material improvement, the recovery, if it occurred, would probably be a very slow and gradual process.

In view of this evidence we cannot say that the verdict in excessive.

The commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion by SUTTON, C., is adopted as the opinion of the court.

The judgment of the circuit court is accordingly affirmed. *Haid, P. J.,* and *Becker* and *Nipper, JJ.,* concur.