KATHRYN HULEN v. WILLIAM W. WHEELOCK and WILLIAM G. BIERD, Receivers of CHICAGO & ALTON RAILROAD COMPANY, LOUISIANA & MISSOURI RIVER RAILROAD COMPANY and A. P. GREEN FIRE BRICK COMPANY, Appellants.—300 S. W. 479.

Division One, December 7, 1927.

504

*A. C. Whitson* and *Charles M. Miller* for the Receivers and Louisiana & Missouri Railroad Company.

*Fry & Hollingsworth* for appellant A. P. Green Fire Brick Company.

*Rodgers & Buffington* for respondent.

RAGLAND, J.—Plaintiff was a passenger on one of the trains of the Chicago & Alton Railroad Company, going from Fulton, Missouri, to Mexico, Missouri. As the train approached Mexico and after it had gotten within the city limits, it ran off the main line of the railroad through an open switch and onto a side track, where it violently collided with cars which were stored there. She seeks in this action to recover for personal injuries sustained as the result of the collision.

The defendant, The Louisiana & Missouri River Railroad Company (hereinafter called the Railroad Company), was the owner and lessor of the railroad over which plaintiff was traveling at the time of her injury; the Chicago & Alton Railroad Company was the lessee; defendants William W. Wheelock and William G. Bierd (hereinafter called the Receivers) were operating the road as receivers of the Chicago & Alton, duly appointed by the District Court of the United States for the Eastern Division of the Northern District of Illinois; and defendant, The A. P. Green Fire Brick Company (hereinafter called the Brick Company), owned an extensive plant for the manufacture of brick lying adjacent to both the railroad and the corporate limits of the city of Mexico.

The facts for the most part are not in dispute. The general direction in which the railroad ran from Fulton to Mexico was north. As it approached Mexico, however, it turned northeasterly on a twenty degree curve. On the north and west side of the curve and immediately adjacent thereto lay the plant of the Brick Company. From the main line of the railroad two spur tracks extended into the brick plant. They were connected with the main line by switches. The first or more westerly switch was known as Switch No. 1; the second, as Switch No. 2. From No. 1 to No. 2 was 556 feet. There was still another switch down 309 feet east or north of Switch No. 2, and on the curve heretofore referred to, known as Switch No. 3. At this switch a side track ran off from the main line and paralleled it on the north and west side on into the city of Mexico. Switches Nos. 2 and 3 had what are called target switch stands. Including the lamp on top, which was not kept burning during the day, each was thirty inches high from the tie on which it rested, and the target on each showed green when the switch was closed, but red when it was open. The colors on the targets, however, were somewhat faded and weather-stained.

The spurs running into the brick plant property were used for bringing in cars loaded with coal and material for the manufacture of brick, and for taking out to the main line cars loaded with the finished product. For the accommodation of the Brick Company the Receivers permitted it to move cars from the spurs heretofore mentioned out onto the main line and thence east through Switch No. 3 onto the side track. On the morning of November 8, 1922, one

Wanstreet, an employee of the Brick Company, under the direction of its superintendent, moved some box cars from one of the spurs of the brick plant out over the main line and through Switch No. 3 onto the side track and spotted them 208 feet east of the switch. He completed the operation about 10:30 A. M. Wanstreet had had some experience as a railroad switchman; he was familiar with the time schedule upon which the Receivers ran their passenger trains; and he knew that a train from the south was due at Mexico at 11:35 A. M. Notwithstanding, he left Switch No. 3 open after completing the switching operation just referred to, and went on back to the brick plant. The fact that the switch had been left open did not occur to him again until about noon when he saw the passenger train from the south coming. Upon seeing it he ran for the switch, but the train reached it before he did and ran on through onto the side track and into the cars he had set there. Plaintiff was a passenger on the train, and as a result of the collision received the injuries heretofore referred to.

The petition after charging by appropriate averments that defendant Brick Company was guilty of a specific act of negligence, to-wit, the leaving of Switch No. 3 open, alleged: "That the negligence aforesaid of defendant Brick Company caused and directly contributed and concurred to cause and became a part of the direct cause of the plaintiff being injured in the manner and to the extent as hereinafter stated." The petition next, after averring that plaintiff was a passenger on one of the trains of the defendant Railroad Company (meaning both the Railroad Company and the Receivers), alleged: "That while plaintiff was a passenger as aforesaid on defendant Railroad Company's said train and while said defendant was operating and running said train and when and while said train was at or about the west end of the city of Mexico, Missouri, the defendant Railroad Company carelessly and negligently caused and permitted the said train on which plaintiff was riding to come in violent collision and to collide with another car and train of cars under the control of defendant, which said other car and train of cars were at the time of said collision on a side track and on the same track as the track the train ran on and along in which plaintiff was a passenger; that the negligence aforesaid of the defendant Railroad Company caused and directly contributed and concurred to cause and become a part of the direct cause of plaintiff being injured in the manner and to the extent hereinafter stated."

The answer of the defendant Brick Company, following a general denial, alleged:

"This defendant states that the employees of defendant receivers and of the defendant railroad companies in charge of said railroad locomotive and train of cars, described in plaintiff's petition, saw, or

by exercise of ordinary care could have seen, that the rails öf said stockyard switch, where they join the main line track, were open, that the switchstand which operates said stockyard switch was so turned as to show that said switch was open; that there were cars on said stockyard switch into which said locomotive and train of cars would run and collide, if said train ran through said open switch and onto said stockyard switch; and this defendant states that said employees of said defendant Receivers and Railroad Companies saw, or by the exercise of ordinary care could have seen, the above conditions in ample time to have stopped said locomotive and train of cars, or in time to have stopped or checked the speed of said train before running into said open switch, or, and before running said train into said cars on said stockyard switch, and could have avoided said collision described in plaintiff's petition.

"Wherefore defendant, A. P. Green Fire Brick Co. says that any injuries received by plaintiff, on the occasion of said collision described in her petition, were the result of negligence of the defendant Receivers and Railroad Companies, as above set forth, and that said injuries were not caused in any degree by this defendant."

The Receivers and the Railroad Company answered with a general denial.

With respect to the last pleading on the part of the plaintiff, we have this recital in the abstract: "That thereafter, respondent duly filed reply, which was a general denial to the answers of appellants."

Following the opening statement and upon the first offer of evidence by plaintiff, defendants Railroad Company and Receivers objected to "the introduction of any evidence under the petition against them and under the opening statement of counsel, for the reason that the same do not state facts sufficient to constitute a cause of action against either of these defendants." The objection was overruled.

Plaintiff in chief offered evidence tending to show: first, that she was a passenger on one of the trains being operated by the Receivers and that while being so carried as a passenger the train upon which she was riding violently collided with cars standing on a side track, whereby she was injured; and second, that said train ran off the main track through an open switch and onto the side track where the collision occurred, and that the switch through which it ran had been left open by an employee of the Brick Company under the circumstances heretofore narrated. After having offered this proof, in addition to proof showing the nature and extent of her injuries, plaintiff rested. Thereupon each of the defendants requested an instruction in the nature of a demurrer to the evidence. All were overruled. Following the overruling of the demurrers, the Railroad Company and the Receivers announced that they had no evidence to offer.

510

The Brick Company, however, then assumed the burden of attempting to show that the Receivers were guilty of the specific negligence with which they were charged in its answer and that such negligence was the sole cause of plaintiff's injuries.

The Brick Company first introduced evidence, which included a plat and photographs, tending to show the relative locations of the brick plant, main line of railroad track, the spur tracks and side track and the three switches; the distances of the switches, each from the other, and the distance from Switch No. 3 to the point on the side track where the passenger train came into collision with the box cars; the contour of the ground on which all of these objects were located as being generally level; and the lack of obstruction of any kind which would prevent the engineer of a train approaching from the south from seeing the target on Switch No. 3 when he had reached Switch No. 2. It next called to the witness stand one Brown, the engineer in charge of the train on which plaintiff was being carried, who testified in part as follows: That the train when it reached Switch No. 1 was running at the rate of about twenty-five miles an hour; that he then began slowing it down for the station at Mexico, so that its speed had been reduced to about fifteen miles an hour when it passed Switch No. 2 and to approximately twelve miles an hour when it reached Switch No. 3; that while running at twelve miles an hour it could have been stopped, all the conditions considered, within 150 feet; and that from his position in the cab he could have seen the target of Switch No. 3 at the time his engine was passing Switch No. 2, and from such view could have told whether the switch was open or closed. He further testified, in substance, that it was his duty as he approached the city of Mexico to look ahead for the switch targets to see whether any of them indicated an open switch, but as he had never found one of them open he directed his attention on the occasion in question more particularly to the road crossings to see whether any automobiles were approaching; that he did not discover that Switch No. 3 was open until some time after he had passed Switch No. 2, and then not from the position of the target, but from the open switch points; and that upon making the discovery he immediately set the brakes, reversed the engine and jumped, as did his fireman.

After the Brick Company had offered the evidence indicated in the preceding paragraph it rested, and the defendants Railroad Company and Receivers called a witness in rebuttal. This witness was the trainmaster for the Chicago & Alton Railroad, and in response to the question whether he had ever given the Brick Company permission to use the stockyard switch (No. 3), he said, "No." He was then examined further, in connection with the photographs which had been offered by the Brick Company, and testified, in substance,

that the switch stand in Switch No. 3 was the type generally used by railroads on branch lines; that that particular switch stand (the railroad at that point passed through a shallow cut) being low and necessarily set against the bank could not be seen from a locomotive engine coming around the curve until the engine had gotten to a point very close to the switch. At the conclusion of this witness's testimony the defendants Railroad Company and the Receivers rested. The plaintiff then put on some rebuttal evidence, tending to show that the engineer could have discovered the open switch in ample time to have stopped before colliding with the cars on the side track.

At the conclusion of all the evidence the Railroad Company and the Receivers again demurred to the evidence. These demurrers were also overruled. The cause was then submitted to the jury under instructions given by the court, presently to be noted, and a verdict returned in favor of plaintiff and against all the defendants, assessing her damages at $10,000.

At the instance of plaintiff the court gave, among others, instructions designated as "A," "B," "D" and "E." Instruction "A" advised the jury what facts were necessary to constitute plaintiff a passenger. By Instruction "B" they were told that, if they found that plaintiff was a passenger on the train mentioned in the evidence "and that the servants and operatives of the defendant Receivers in charge of said train negligently failed to exercise the highest degree of care in the operation of said train and that such negligence, if any, directly contributed to cause the collision referred to in the evidence and such injury, if any, that plaintiff sustained," then they should find for her and against the Railroad Company and the Receivers. Instruction "D" told them that if they found that an employee of the Brick Company "while acting within the scope of his employment, opened the switch to the side track mentioned in the evidence, and that he negligently failed to close said switch, and that said negligence, if any, directly contributed to cause the collision referred to in the evidence, and such injury, if any, as plaintiff sustained," then their verdict should be for plaintiff and against the Brick Company. Instruction "E" was a combination of instructions "B" and "D." The first paragraph was a repetition of all of "D," except the concluding clause, "then your verdict will be, etc.;" the second paragraph following "And if you further find," was a reiteration of "B" except the similar concluding clause; the instruction as a whole concluded with a direction to find for plaintiff and against all of the defendants. The instruction on the measure of damages concluded as follows: "But such sum as you may allow plaintiff shall not exceed the sum of Twenty-five Thousand ($25,000) Dollars."

For the Brick Company the court instructed, in effect, that if the jury found that the engineer was negligent and that his negligence

was the sole cause of the collision, their verdict must be in favor of that defendant.

The foregoing sufficiently outlines the facts and the procedure followed in the trial of the cause in the circuit court.

The appellants Railroad Company and the Receivers assign as error: (1) the action of the trial court in overruling their objection to the introduction of any evidence; (2) the refusal of their demurrers to the evidence at the close of plaintiff's case in chief, and again at the close of all the evidence; (3) the improper reception of certain evidence over their objection; and (4) the giving and refusal of designated instructions. Appellant Brick Company assigns as error the refusal of an instruction asked by it. All insist that the verdict is excessive. We will reserve a consideration of the rulings complained of as they affect the Railroad Company until we have disposed of those with reference to the other appellants.

I.  1.  The Receivers' first insistence is that their objection to the introduction of any evidence as against them should have been sustained. They assert that from the pleadings on the part of plaintiff, the petition and the reply, and her opening statement, it conclusively appears that the cause of her injuries was the act of the employee of the Brick Company in failing to close the switch, and that having full knowledge of the specific act of negligence which caused her injuries, one for which the Receivers were in no way responsible, she cannot as against them invoke the doctrine *res ipsa loquitur*. The contention is based, it would seem, on the assumption that the leaving of the switch open by the Brick Company was the sole cause of the collision and resulting injuries. The Brick Company on the other hand argues, and with plausibility, that the open switch was not in a juridical sense *the cause* of the collision, but a mere existing *condition*, which, had the Receivers been exercising the requisite degree of care, would have been discovered and remedied by them in time to have avoided the accident. When the train on which plaintiff was being carried ran with such violence into cars standing on the track as to cause her injuries, there arose an inference of fact that the Receivers had not exercised that high degree of care which the law requires of a carrier of passengers. It therefore devolved upon them to show that the accident was inevitable, that is, that it could not have been avoided by the exercise of the highest degree of care. Had the suit been against the Receivers alone and had they answered that the switch had been opened by a stranger or intermeddler an hour or more before the train arrived, they would have been very far from acquitting themselves of all negligence in the premises. So the petition, contrary to the opposing theories of the Receivers and the Brick Com-

pany, charges that the negligence of the one concurred with the negligence of the other in causing the collision and injury. Because, in conformity with the rules of pleading, it sets forth the specific acts alleged to constitute the negligence of the Brick Company and charges in general terms only the negligence of the Receivers, the petition does not on its face negative liability on the part of the Receivers. It states a good cause of action against each of them, the Receivers and the Brick Company. [Cecil v. Wells, 259 S. W. 844.]

But it is said that the plaintiff by her reply to the answer of the Brick Company, it being a general denial, denied that the engineer, by the exercise of ordinary care, could have seen that the switch was open in time to have stopped his train, and could have stopped it, before it collided with the cars on the side track, and that thereby she relieved the Receivers of the burden of showing that the collision did not result from any negligence on their part. It is not probable that plaintiff intended to deny that the engineer was negligent, but merely that his negligence, if any, was not the *sole* cause of the collision. But if the technical construction for which the Receivers contend be applied to it, the conclusion they base on it can be justified only on the assumption that the engineer's negligence was the only possible negligence attributable to them. While on the contrary the jury would have been warranted in finding, on the facts in proof, that the Receivers were negligent in many other respects. One immediately suggests itself and that will suffice. They turned over a portion of their main track, along and over which they regularly ran passenger trains, to an unrelated industrial plant for use by the latter in switching operations of its own, without employing a single precautionary measure, so far as the record discloses, to insure that the tracks would be clear and the switches properly lined at the times it would be necessary for them to use the tracks in the operation of their trains.

A careful reading of the opening statement fails to disclose any committal on the part of the plaintiff that the leaving of the switch open was the *sole* cause of the accident. The statement was a mere narration of facts which plaintiff proposed to establish by the evidence and which, if established, would support the allegations of the petition in their entirety.

2. The insistence of the Receivers that their demurrers to the evidence should have been sustained is based on the same hypotheses as the contention that their objection to the introduction of any evidence was valid and for like reasons must fail.

II. Two witnesses, Ellis, called by the Brick Company, and Edwards, put on by plaintiff in rebuttal, each testified that by actual test he had ascertained that one in a stooping position at Switch No.

514

3 could see and clearly distinguish the features of the engineer on a train approaching from the south, when the engine reached Switch No. 2. The testimony in each instance was objected to by the Receivers on the ground that it was irrelevant, did not tend to prove any issue in the case. We do not deem it necessary to pass upon the validity of the objection. It is sufficient to say, that in view of the testimony of the engineer himself that when he arrived at Switch No. 2, he could have seen the target on Switch No. 3, 309 feet away, and that he could have stopped his train within 150 feet, the error of receiving the testimony of Ellis and Edwards, if its reception was error, was entirely harmless.

III. The Receivers complain of plaintiff's Instructions "B" and "E." They say it was error to give them for the same reasons that their demurrers to the evidence should have been sustained; and for the further reason that they gave to the jury "a roving commission." The grounds first advanced we have already considered. With respect to the last it is sufficient to say that the instructions were in the form which we have universally approved in cases of this character; they were no broader in scope than the general negligence pleaded and were therefore sufficiently specific. [Stauffer v. Railroad, 243 Mo. 305, 147 S. W. 1032; Olsen v. Railway, 152 Mo. 426, 54 S. W. 470.]

The Receivers further complain of the instruction given at the request of the Brick Company. This instruction in effect told the jury that if they found that the engineer saw, or by the exercise of reasonable care could have seen, the open switch in time thereafter to have slackened the speed of the train and brought it to a stop and thereby avoided the accident, that he failed to do so and that such failure was the sole cause of the collision, their verdict should be for the Brick Company. It is said that the instruction not only unduly emphasized the alleged negligence of the engineer, but that it was without support in the evidence. Both contentions are so palpably without merit that they do not require discussion. It is further said, however, that the giving of the instruction was error, because under the pleadings and the evidence in the case, it should be held as a matter of law that the alleged negligence of the engineer was *not* the sole cause of the collision. The engineer's testimony on its face conclusively shows that he was negligent. If the Brick Company had been sued alone, it is clear that it would have had the right to interpose as a defense that the negligence of the engineer, which was later in point of time than that of its employee, was the proximate cause of plaintiff's injury. And it is equally clear that it would have had the right to have had that question passed on by the jury. It certainly cannot

be deprived of those rights merely because it was sued jointly with the Receivers. But in any event the Receivers suffered no harm because the jury found against the Brick Company.

What has just been said disposes of a further assignment, namely: that the trial court erred in refusing to instruct that as a matter of law the engineer was not negligent "in not seeing the switch open and stopping his train before it collided with the cars standing on the stock side track."

IV. The Brick Company assigns as error the refusal of the court to instruct the jury, in effect, that the negligence of the engineer was as a matter of law the proximate cause of plaintiff's injuries. Under the evidence the question of proximate cause was one of fact and therefore one which it was the province of the jury to determine. "The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it." [Milwaukee Ry. Co. v. Kellogg, 94 U. S. 469, 474.]

V. Appellants join in challenging the verdict on the ground of excessiveness. The evidence tends to show that as a direct result of the collision the plaintiff, in addition to broken ribs, suffered such injury to her sexual organs that retroversion of the uterus and chronic inflammation of a tube and ovary resulted. The evidence tends to further show that these conditions are permanent and that they will not only effect a lasting impairment of plaintiff's general health, but will subject her to periods of intense pain and suffering during the remainder of her life. We are unable to say that the damages awarded are excessive.

The instruction on the measure of damages contains the same vice as that criticised in a similar instruction in Bond v. Railroad, 288 S. W. 777. It does not appear, however, that the defendants were in any way prejudiced by reason of it.

VI. We come finally to consideration of the contention of the Railroad Company that it is not liable for the negligence of the employees of the Receivers. Touching the relationship, if any, existing between it and the Receivers, the record is extremely meager. The proof, in the form of admissions of counsel, discloses merely that The Louisiana & Missouri River Railroad Company is a Missouri corporation and is the owner of the railroad in question: that prior to the occurrences giving rise to this suit, it leased its road to the Chicago & Alton Railroad Company, an Illinois corporation; and that the road was being operated by the

Receivers of the property of the last named corporation when plaintiff sustained the injuries sued for.

It is the universally accepted doctrine that a railroad company, in the absence of legislative permission, cannot through contract or other arrangement voluntarily surrender its road to another and thereby escape responsibility for the performance of the public duties for which it was chartered. However, a railroad company of this State is authorized to lease its road to the corporation of another State; but the authorizing statute contains the proviso that the leasing company "shall remain liable as if it operated the road itself." [Sec. 9879, R. S. 1919.] The language of the proviso is all-inclusive (Markey v. Railroad, 185 Mo. 360, 84 S. W. 61.); but as broad as it is it cannot be held to impose liability on a lessor railroad for the torts of a stranger who seizes and operates the road against the consent of both lessor and lessee. That in effect is the situation presented by this record. It may be that the Receivers of the Chicago & Alton Railroad have been paying The Louisiana & Missouri River Railroad Company the rental stipulated in the lease and thereby become sub-modo its tenants; or that they have arrived at some independent arrangement or agreement with the owner of the road, as they seem to be still in possession and operating it. But the fact of the Railroad Company's express or implied consent to the Receivers continuing in the possession of its property, if it exists, should have been alleged and proved. On the record no liability on the part of the Railroad Company was shown.

In view of the conclusions reached the judgment should be reversed as to The Louisiana & Missouri River Railroad Company, and affirmed as to the remaining defendants. It is so ordered. All concur, except *Gantt, J.*, not sitting.